Cyneth K. DAHM, Plaintiff,

v.

William F. FLYNN, Jr., Defendant.

No. 92–C–529–C.

United States District Court,
W.D. Wisconsin.

June 24, 1993.

Richard V. Graylow, Lawton & Cates, Madison, WI, for Cyneth K. Dahm.

Richard Moriarty, Asst. Atty. Gen., Madison, WI, for William F. Flynn, Jr.

## ORDER

CRABB, Chief Judge.

In this civil action brought pursuant to § 1983, a former employee of the Wisconsin Lottery charges that the former director of the Lottery retaliated against her for raising questions about agency morale at a legislative audit hearing.

The case is before the court on the parties' cross-motions for summary judgment and plaintiff's request for an interlocutory order dismissing certain affirmative defenses. I conclude that plaintiff has failed to show that the actions taken allegedly by defendant were of a kind that would tend to chill a reasonable person's exercise of her First Amendment rights, and therefore she has failed to establish a deprivation of constitutional magnitude. Defendant's motion for summary judgment will be granted.

To succeed on a motion for summary judgment, the moving party must show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1412 (7th Cir.1989). When the moving party succeeds in showing the absence of a genuine issue as to any material fact, the opposing party must set forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986); *Bank Leumi Le-Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir.1991). The opposing party cannot rest

on the pleadings alone, but must designate specific facts in affidavits, depositions, answers to interrogatories or admissions that establish that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. Also, if a party fails to make a showing sufficient to establish the existence of an essential element on which that party will bear the burden of proof at trial, summary judgment for the opposing party is proper. *Id.* at 322, 106 S.Ct. at 2552.

For the purpose of this motion only, I find from the parties' proposed findings of fact that the following material facts are not in dispute.[1]

### FACTS

Defendant Flynn was executive director of the lottery from its inception in January 1988 to September 30, 1992. Prior to becoming executive director, Flynn had been deputy director of the Colorado Lottery. He had no experience with personnel policies or practices of Wisconsin state agencies.

Plaintiff was employed as personnel director at the Wisconsin Lottery from April 4, 1988 until April 3, 1992. Plaintiff's position was in the personnel services bureau, one of five bureaus within the Administration and Operations Division, one of five divisions within the lottery. Plaintiff reported to and was supervised by the Director of the Administration & Operations Division, a position occupied by Bernard Mrazik from February 1988 to December 1991. Mrazik had prior experience in running Wisconsin state agencies and defendant Flynn allowed him relatively free rein in his position.

Plaintiff was responsible for the recruitment and hiring of employees for all the classified positions in the Lottery. She either wrote or reviewed all position descriptions and was involved in interviewing and orienting new employees. The position description defining plaintiff's role as personnel director included a wide variety of personnel-related duties, among which were the staffing and classification of positions, employee relations and grievance processing, affirmative action, employee assistance, training, and ensuring agency compliance with civil service regulations. Pursuant to her job description, plaintiff was to report to Mrazik concerning all her job duties except affirmative action issues, for which she was to report to defendant Flynn.

From April 1988 to February 1991, plaintiff accompanied Mrazik approximately once a month to his meetings with defendant. In this period, plaintiff met approximately once a week at a regularly scheduled meeting with representatives from the other bureaus within Administration and Operations.

On December 20, 1988, as a result of her work at the lottery, plaintiff received an honorable mention for an award for outstanding female employees in state service. On June 19, 1990, plaintiff received a performance evaluation from Mrazik in which he stated her performance was above satisfactory. On or about June 26, 1990, plaintiff received an "Exceptional Performance Award," at which time defendant Flynn sent Plaintiff a cover letter recognizing her outstanding work performance. Nonetheless, after plaintiff was hired, it was Flynn's belief that she had difficulty in writing position descriptions, had not taken appropriate steps in hiring an accountant and had mishandled several reclassification requests.

On April 25, 1989, plaintiff distributed a statement to all employees of the Wisconsin Lottery detailing the procedures for handling reclassification requests. A reclassification is a personnel action which permits state employees to raise their civil service classification to reflect a logical and gradual increase in the amount or complexity of duties performed by the employee. Reclassification entails an upward adjustment in salary. Requests are assigned an effective date commencing with the first date of the pay period subsequent to filing. For any reclassification request that is ultimately approved backpay

1. In an order dated June 15, 1993, I stated that I would not give consideration to affidavits filed by plaintiff in support of her response to defendant's additional proposed findings of fact. Plaintiff requests that the court reconsider this order. I will deny the request. I have ignored the additional facts proposed by defendant to which plaintiff's additional affidavits relate because they are not necessary to the resolution of this motion.

is calculated from this effective date. Plaintiff considered the reclassification audits she performed at the lottery to be more complex and time-consuming than in her previous experience because the lottery positions were new and each position had yet to be established as part of an automatic progression series.

. Out of 145 positions at the Wisconsin Lottery, 26 reclassification requests were received during 1989. Plaintiff and her assistant, Kathy Gerber, completed auditing only two of those requests by the end of 1989 (with two other employees having transferred to. other agencies). During 1990, plaintiff and Gerber completed audits for 17 of the requests made in 1989 and two of 19 requests made in 1990.

Plaintiff met regularly with employees to answer questions regarding personnel issues. By mid–1989, the number of employee meetings had become a daily occurrence. Employees expressed dissatisfaction with management, particularly, that supervisors disregarded their questions in a hostile and non-conciliatory manner. It was plaintiff's opinion that the repeated conflicts between supervisors and employees were resulting in declining employee morale at the lottery. In response, plaintiff proposed to create an employee handbook that would include an approved grievance procedure.

In mid–1990, the Legislative Audit Bureau conducted a program audit of the lottery. As part of its audit report, the bureau describes issues raised during program audits that the Audit Director determines to be of legislative and public interest. Two lottery employees interviewed initially by the bureau alleged the existence of an employee morale problem stemming from management practices and indicated to the bureau personnel that plaintiff was attempting to address employee dissatisfaction. Following this lead, the Audit Director, Patrick Cooper, and Laura Sausen, an audit program analyst, approached plaintiff, stating only that they wished to interview her pursuant to a routine audit.

Dahm met with Sausen and Cooper at the lottery on or about September 28, 1990. When asked about employee morale, plaintiff stated that a problem existed. She told Cooper that the source of low employee morale stemmed in part from: (1) Flynn's refusal to approve or deny reclassification audit recommendations completed by Dahm; (2) Flynn's refusal to approve an employee manual that included a grievance procedure; and (3) Flynn's refusal to discontinue use of an applicant personal history statement that lottery legal counsel had advised was likely in violation of the Wisconsin Fair Employment Act. In addition, plaintiff stated that she understood from discussions with lottery employees that the treatment of employees by supervisors was damaging morale. Plaintiff did not express dissatisfaction with the terms of her own work. After the meeting, plaintiff told lottery legal counsel Michael Liethen that Sausen and Cooper were available to speak with other employees concerning the audit.

The lottery audit report released to the public on January 24, 1991 contained a section describing the employee morale problem. During Cooper's tenure at the Legislative Audit Bureau, he has been involved in conducting approximately seventy program audits, fifty of which he directed. The lottery audit report was only the second released by Cooper that included a section on employee morale. Bureau officials included this section only after conducting thirty additional interviews with lottery employees to ascertain (1) that a consistent pattern of complaints and concerns existed; and (2) that this pattern had at least the potential to affect the performance of the lottery adversely.

Bureau auditors noted the following as common problems cited by employees: (1) lack of interest by top managers in staff concerns and opinions; (2) rigid adherence to the chain of command; and (3) an environment of intimidation and lack of recognition of staff contributions. The auditors identified the following management practices to be among the sources of employee grievances: (1) positions held vacant for too long; (2) lack of movement on reclassification requests; (3) perceived abuse by top level managers. The report recommended that "[t]he Executive Director develop, by May 1, 1991,

a strategy for identifying and addressing the causes of low employee morale."

Defendant Flynn responded to the Legislative Audit Bureau in a letter dated January 22, 1991, in which he discussed the charges of low employee morale. Among the issues addressed by Flynn concerning morale was the perceived reclassification problem. Flynn explained that the lottery had expected a high number of reclassification requests because it was a new organization. On February 25, 1991, Mrazik drafted a letter that Flynn sent to the Joint Legislative Audit Committee that would be conducting hearings on the lottery audit report. The letter did not mention the reclassification backlog but did indicate that the lottery intended to produce a formal employee handbook.

Plaintiff appeared at a public hearing held by the Joint Legislative Audit Committee on February 26, 1991. She testified that the employee morale problem was caused by the poor managerial practices of defendant Flynn and other managerial personnel at the lottery. She noted that, contrary to defendant Flynn's statement in the audit report, the lottery was not constructively addressing employee concerns as they arose. She mentioned as examples, Flynn's refusal to meet with an employee about a job restructure; a prohibition on district office employees' calls to Madison without prior approval, and failure to address concerns about misuse of a state vehicle and drinking on the job. Plaintiff testified further that she had not been included in developing the lottery's strategy to improve employee morale.

In a conversation between Flynn and Mrazik immediately following Dahm's testimony, Mrazik told Flynn that the testimony would not improve employee morale and Flynn said that it was not a positive thing for the lottery. At no time did Flynn instruct or direct Mrazik to reduce the involvement of the personnel bureau in any of the operations of the lottery. However, after Dahm's testimony, Mrazik perceived that plaintiff and Flynn did not communicate directly with one another as often as they had before. Therefore, he filtered statements each of them made regarding the other in order to avoid worsening the differences between them.

After her testimony of February 26, plaintiff accompanied Mrazik to only one personnel meeting with Flynn, whereas prior to her testimony she did so once a month; she never met with Flynn alone concerning affirmative action issues, whereas she had met with him once before her testimony; she was excluded from personnel issues involved in the reorganization of the sales division in July 1991 and from involvement with the defense of a pending Fair Labor Standards Act lawsuit; she was removed from the process of filling an attorney position at the lottery; she was prohibited from contacting district sales managers directly concerning the interpretation of work rules, which she had done prior to her testimony; and her roles in handling employee grievances and affirmative action issues were diminished. In addition, Flynn ceased consideration and implementation of a proposed employee handbook in part because Dahm was its author; Mrazik wrote plaintiff memoranda criticizing her performance; and certain personnel work was delegated directly to Dahm's assistant, undermining plaintiff's supervisorial role.

Some time in the spring, Flynn suggested to Mrazik that Mrazik provide closer supervision of plaintiff. Flynn stated that he believed Dahm tended to exacerbate morale problems by stirring people up rather than resolving problems.

On March 28, 1991, plaintiff wrote a memorandum at Mrazik's request regarding her ability to complete a backlog of reclassification audits for requests made by employees in 1989 and 1990. She identified "time consuming projects I am currently working on that interfere with my ability to complete reclass audits" as including "attorney recruitment" and the "Employe Handbook" and promised to do her best to get rid of the backlogs by July 1, 1990. She indicated further that work on reorganization of the division of sales would detract from her ability to eliminate the backlog by this time. Flynn believed that a lack of an employee handbook was not as great a source of low morale as inaction on reclassifications.

In a letter Mrazik drafted and Flynn sent to the Co–Chairs of the Joint Committee on May 1, 1991, Flynn stated:

Staff have also been concerned about a major backlog in reclassification requests ... To remove this backlog Lottery Personnel staff have developed a plan to process all requests received prior to January 1, 1991 by August 1, 1991. The balance of the requests will be reduced to no more than a four month period between the time the completed request is received in the Personnel Office and the time the employe receives a response to the request.

As of August 1, 1991, there remained outstanding two reclassifications from 1989 and 9 from 1990. Of the reclassification requests filed in 1991, four remained uncompleted at the time of plaintiff's resignation and the remainder had not been completed within 4 months.

Flynn told Mrazik that he wished to have the employee handbook presented to him as a final draft and not simply as a collection of alternatives. Mrazik and plaintiff failed to do so despite what Flynn perceived as Dahm's inordinate expenditure of time working on drafts at what he considered to be the expense of completing reclassification requests. An employee handbook was not adopted until February 1992, and it was prepared by a designated Employee Handbook Team.

On April 25, 1991, plaintiff sent a memorandum to Flynn, Lottery Deputy Director Diane Harmelink and Mrazik complaining that they did not meet to define her relationship as Affirmative Action Officer with the newly established Affirmative Action Advisory Committee. Mrazik responded by memorandum dated April 30, 1991 that he did not think a meeting was required because all the parties acknowledged her role to be a non-voting advisory one.

In numerous incidents in the spring of 1991, Flynn received reports of plaintiff's behavior that suggested to him that she had behaved so as to stir up confrontations with the union, had been insubordinate to Mrazik in a meeting with union representatives, and had expressed dissatisfaction at having to do both the reclassifications and work on the reorganization of the Division of Sales.

On June 3, 1991, plaintiff sent a memorandum to the Director of Sales, Don Walsh, as well as the district sales managers under his supervision, requesting to be informed of any decisions on work rules made by district sales managers. Walsh sent a memorandum to Mrazik objecting to plaintiff's memorandum as interfering with the chain of command and undermining Walsh's authority. Mrazik wrote a memorandum to Dahm stating that she should have gone through Walsh for inclusion of her request on the sales division agenda. However, Mrazik did not consider it inappropriate for plaintiff to have direct contact with district sales managers concerning work rules.

In June 1991, Mrazik issued a performance evaluation for plaintiff that he considered to be a positive one. On July 2, 1991, plaintiff wrote a five-page single-spaced typewritten memorandum to Mrazik in which she defended herself against numerous criticisms Mrazik had made, including her alleged failure to involve supervisors when an employee registered a complaint. She noted that frequently she was prevented from doing so because employees requested confidentiality.

Sometime in the summer of 1991, Flynn asked Mrazik what Mrazik was doing to control plaintiff. When Mrazik questioned Flynn about what he should do, Flynn responded: "Well, she works for you. You hired her. It's up to you to control her." Mrazik instituted a policy requiring plaintiff to put her work tasks in writing so as to provide something tangible to Flynn.

On August 2, 1991, plaintiff wrote a letter to Flynn and the Joint Legislative Audit Committee stating that morale continued to deteriorate because the lottery had failed to take steps to improve morale. In a memorandum to plaintiff dated August 14, 1991, Mrazik criticized Dahm's letter as misleading and questioned the appropriateness of her raising allegations of potentially disciplinable behavior in a public memorandum.

In October or November of 1991, Mrazik and Flynn had a discussion about plaintiff in the context of Flynn's need to appear again

before the legislature. Flynn stated: "I can't continue to go up to the legislature and have her be there too," by which Mrazik understood him to mean that Flynn wished to have plaintiff discharged.

On December 19, 1991, Flynn appointed Mrazik to the position of administrator of sales in the lottery. In early 1992, Maureen Hlavacek was appointed to Mrazik's former position of Director of Administration and Operations. Hlavacek told plaintiff that plaintiff was considered "damaged" as a result of her testimony before the Joint Legislative Audit Committee.

On or about February 27, 1992, plaintiff was advised at a staff meeting that her position was one of two classified positions to be eliminated under a budget proposal of the Joint Finance Committee. Flynn opposed the Joint Finance Committee proposal, including the elimination of the position of personnel director.

Plaintiff filed a complaint with the Wisconsin Personnel Commission on or about March 10, 1992 in which she alleged discrimination in the form of "deskilling" of her role as personnel director and the proposed elimination of this position. She resigned from the lottery on March 26, 1992 to become personnel specialist with the Department of Veterans Affairs, a position involving less authority than personnel director.

## OPINION

■ The majority of cases that concern the free speech rights of public employees involve retaliation in the form of a discharge. Indeed, in *Rutan v. Republican Party of Illinois*, 868 F.2d 943, 953–54 (7th Cir.1989), in the context of a case challenging patronage appointments, the Court of Appeals for the Seventh Circuit adopted the position of the Fourth Circuit that only an actual or constructive discharge is sufficiently adverse to state a cognizable First Amendment claim. This holding was overturned by the Supreme Court. *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990). The Court explained that a government may not "deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially his

interest in freedom of speech." *Id.* at 72, 110 S.Ct. at 2736 (quoting *Perry v. Sinderman*, 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972)). Denials of benefits include not only decisions to discharge, but also those involving promotion, recall and transfer. The Court noted: "Employees denied transfers to workplaces reasonably close to their homes until they join and work for the Republican Party will feel a daily pressure from their long commutes to do so." *Id.* 497 U.S. at 73, 110 S.Ct. at 2736. This mundane observation captures the standard by which district courts must evaluate whether certain employment decisions violate the First Amendment. To state a cognizable claim, a plaintiff must show job actions that adversely affect the terms of employment such that they are likely "to chill the exercise of the constitutionally protected speech." *McGill v. Board of Ed. of Pekin Elementary School*, 602 F.2d 774, 780 (7th Cir.1979).

It is instructive to look at cases in which the courts have held that job actions short of constructive or actual discharge are sufficient to state a claim. In *Yoggerst v. Stewart*, 623 F.2d 35, 39 (7th Cir.1980), plaintiff was given a verbal and written reprimand for speaking. The court concluded that such discipline is sufficient to chill speech because it conveys the message that one will be discharged for like speech in the future. *Id.* at 39. In *McGill*, 602 F.2d at 780, the court considered a transfer of a teacher to another school at no loss of pay to be sufficient although such actions did not implicate the possibility of discharge.

■ Even petty harassment is actionable if it is of a sufficient degree and duration that it would be likely to deter a person of reasonable firmness from the exercise of free speech. *Bart v. Telford*, 677 F.2d 622 (7th Cir.1982); *Pieczynski v. Duffy*, 875 F.2d 1331, 1333 (7th Cir.1989). In *Bart*, the court commented on a campaign of petty harassment that included ridicule over plaintiff's participation in an office birthday party. The court noted: "The effect on freedom of speech may be small, but since there is no justification for harassing people for exercising their constitutional rights it need not be

great in order to be actionable." *Id.* at 625. In *Pieczynski*, 875 F.2d at 1335, plaintiff was subjected to harassment in the form of false accusations, her duties were confined to monotonous paper work, she was called a liar, her long-distance privileges and supervisory authority over other employees was curtailed, her requests for administrative leave and vacation time were denied, and she was subjected to other petty actions. The court opined that a rational jury could have concluded that plaintiff "was a victim of a calculated campaign to humiliate her [or] drive her to resign...." *Id.*

Recently, the Court of Appeals for the Seventh Circuit summarized these precedents in the following manner:

> "*McGill* recognized a proposition that cannot be denied: an employer can penalize past speech and discourage future speech by assigning a worker to an undesirable job.... Supervisors control many sources of satisfactions, from the cleanliness of the workplace to the allocation of parking spaces. Rewards and penalties are most visible to judges when stated in monetary terms—say, supporters receive 20% more than critics—but incentives are no less effective when they are subtle. A campaign of petty harassment may achieve the same effect as an explicit punishment."

*Walsh v. Ward,* 991 F.2d 1344, 1345 (7th Cir.1993).

■ In this case, however, plaintiff was not discharged, disciplined, transferred, demoted or denied promotion.[2] She was not subjected to a campaign of petty harassment in the form of wrongful accusations, trumped-up disciplinary measures, insults, or arbitrary denials of job benefits such as vacation time and the like. Instead, the adverse job actions of which she complains come down essentially to a complaint that in retaliation for the exercise of her speech she was denied involvement to the full extent that her job description as personnel director indicated.

The initial problem with plaintiff's assertions is their lack of specificity. Plaintiff asserts that her roles in handling employee grievances and affirmative action issues was diminished but she does not specify in what manner or to what extent. She states that she was excluded from involvement in personnel issues in the reorganization of the sales division and in the defense of a pending Fair Labor Standards Act lawsuit, but she fails to explain the importance of either of these assignments. Again, she asserts that certain personnel work was delegated directly to her assistant, thereby undermining her authority, but she provides no additional information from which one could evaluate the severity of this action. It is not possible to determine whether the job actions alleged by Dahm are more than trivial, except with respect to those actions where it is decidedly clear that they are. For example, it is of no consequence that after plaintiff's testimony she never met with defendant alone concerning affirmative action issues, whereas she had met with him once before her testimony.[3] In sum, plaintiff has failed to establish that the challenged job actions in this case were sufficiently adverse to be cognizable.

A second and more fundamental problem concerns whether the challenged conduct presents the kind of job actions that are cognizable. As the Court of Appeals for the Seventh Circuit recognized in *Walsh,* "the limits of supervisors' ability to affect the satisfaction offered by the public job" are not defined with precision. *Id.* at 1347. Plaintiff would place within the ambit of a cognizable claim job actions that amount to no more than the ordinary day-to-day decisions concerning the assignment of employees to particular activities or tasks well within their job descriptions. More than this is required to show a "chilling" effect. Employees know that, in the normal course of events, their supervisors are going to give them additional tasks, take tasks away from them or reorder

---

**2.** Although the Joint Finance Committee sought to eliminate plaintiff's job, defendant Flynn opposed this proposal.

**3.** With respect to the employee handbook, the undisputed evidence shows that Dahm never presented a final copy to be adopted by the agency. With respect to the critical evaluation received

by Dahm, the evidence shows that Dahm's supervisor did not consider this evaluation a negative one. Dahm does not allege that she was disciplined or reprimanded in any way or that any negative consequences flowed from that evaluation. In any event, the author is not a defendant.

the priority of their tasks. When the new assignments are within the employee's job description and are necessary to the fulfillment of the employer's mission, are not significantly more onerous than previous tasks or than the tasks performed by co-employees, do not require additional work effort, do not carry any connotation of a demotion, and do not constitute a stripping away of the job's core functions, they cannot be characterized as adverse actions. *See, e.g., Dorsett v. Bd. of Tr. For St. Colleges & Univ.,* 940 F.2d 121, 123 (5th Cir.1991) (in the context of a public employee's right to speak free from retaliation, decisions concerning assignments, pay increases, administrative matters and departmental procedures not cognizable); *cf. Crady v. Liberty National Bank & Trust Company of Indiana,* No. 90–C–22, slip. op. at 7 (7th Cir. Jan. 11, 1993) (in the context of an ADEA claim involving private employment, "a materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities.")

In this case, plaintiff complains only that she was denied involvement in certain activities and that her role was diminished with respect to certain functions. Absent evidence that plaintiff's core job responsibilities were altered in a significant way, *cf. Vasbinder v. Ambach,* 926 F.2d 1333 (2d Cir.1991), or the changes in assignment were unduly onerous or were demeaning, I decline to hold that a supervisor's staffing and assignment decisions are sufficiently adverse to chill the speech rights of a person of ordinary firmness. In sum, I conclude that plaintiff has failed to show that the alleged adverse actions taken against her are of constitutional significance.

## ORDER

IT IS ORDERED THAT the defendant's motion for summary judgment is GRANTED.

The Clerk of Court is instructed to enter judgment in favor of defendant and to close this case.