Cyneth K. DAHM, Plaintiff–Appellant,

v.

William F. FLYNN, Jr., in both his individual and official capacities, Defendant–Appellee.

No. 93–2614.

United States Court of Appeals, Seventh Circuit.

Argued April 11, 1994.

Decided Nov. 23, 1994.

As Amended on Denial of Rehearing July 24, 1995.

John C. Talis (argued), Richard V. Graylow, Lawton & Cates, Madison, WI, for plaintiff-appellant.

Richard Briles Moriarty (argued), Wisconsin Dept. of Justice, Madison, WI, for defendant-appellee.

Before CUDAHY, EASTERBROOK, and ROVNER, Circuit Judges.

ROVNER, Circuit Judge.

Cyneth Dahm, the personnel director of the Wisconsin Lottery from 1988 through 1992, brought this action against William F. Flynn, Jr., the Executive Director of the Wisconsin Lottery, for money damages, injunctive relief, and declaratory relief pursuant to 42 U.S.C. § 1983. Dahm claims that Flynn took a series of retaliatory steps against Dahm because Dahm was critical of Flynn when she testified before the Joint Audit Committee of the Wisconsin legislature regarding low employee morale within the Lottery. The district court granted summary judgment in favor of Flynn, holding that Dahm was insufficiently specific in identifying how Flynn retaliated against her and that Flynn's actions were not materially adverse as a matter of law, 825 F.Supp. 224.

## I. Background

We accept the following facts as true for purposes of our discussion, setting aside certain factual disputes and construing the record in a light favorable to Dahm.

In January of 1988, defendant William F. Flynn, Jr. began employment as Executive Director of the newly-created Wisconsin Lottery. A month thereafter, the Lottery hired Bernard Mrazik as Director of the Administration & Operations Division. Mrazik, who was to work with Flynn in creating an organizational plan for the Lottery, hired plaintiff Cyneth Dahm as the personnel director for the Lottery effective April 5, 1988, with the approval of Flynn.

As the personnel director, Dahm initially spent half of her time administering the personnel program of the Lottery, splitting her remaining time between the following activities: 1) performing affirmative action duties; 2) assisting in employee relations, including involvement in grievance meetings and settlements; 3) assisting in employee training and evaluation; 4) coordinating the employee

assistance program; 5) developing policy and procedure, including the creation of an employee handbook; 6) supervising two personnel assistants; and 7) performing as directed special assignments relating to personnel. An important part of Dahm's duties included the processing of employee reclassification requests, which in essence are requests for promotion and back pay. Dahm directly reported to Mrazik regarding all of these duties except affirmative action, for which she reported directly to Flynn. In performing this broad range of duties, Dahm's performance never was rated as less than satisfactory, and once during her tenure she received an Exceptional Performance Award from Flynn.

As part of her employee relations duties, employees often would ask Dahm questions related to personnel issues. In mid–1989, the frequency and intensity of Dahm's meetings with employees increased substantially. On a daily basis, employees expressed their frustrations to Dahm regarding management at the Lottery. Those meetings were endemic of an agency-wide employee morale problem that continued to worsen through mid–1990.

In mid–1990, pursuant to state statute the Legislative Audit Bureau (the LAB), a nonpartisan investigatory arm of the Joint Legislative Audit Committee of the Wisconsin legislature, began conducting a program audit of the Lottery. Investigations by the LAB uncovered the morale problems at the Lottery, and the LAB contacted Dahm to obtain more information regarding employee morale. The LAB interviewed Dahm, and she provided information regarding the Lottery's ability to meet its statutory goals. In January of 1991 the LAB issued a written report which included a section detailing employee morale problems in the Lottery.

After the LAB issued its written report, Dahm agreed to testify at a February 26, 1991 hearing on the report before the Joint Audit Committee (JAC) of the Wisconsin legislature. Dahm testified at the JAC hearing that low employee morale remained a large problem at the Lottery, and she attributed those difficulties to management, including Flynn. Specifically, Dahm stated that "Bill Flynn is aware that fear and intimidation are widespread in our agency and that much of it can be traced to management style."

After this testimony, the nature of Dahm's duties began to change. Among other areas, Dahm's involvement in position staffing, the personnel management program, employee relations, exam development and administration, and the processing of sexual harassment claims was reduced. Certain tasks formerly within her purview were, according to Dahm, delegated by her superiors to Dahm's assistants. Correspondingly, Dahm was given increased responsibility for the processing of pending reclassification requests. Over the course of time, a backlog of reclassification requests had built up, and Dahm was asked to expedite the processing of those requests. Dahm was also required to begin documenting her daily telephone calls and her meetings with Lottery employees. Dahm attributes each of these actions to Flynn. Although the parties dispute the extent to which Flynn had a hand in the assignment of tasks to Dahm, we find the record sufficient to support the inference that Flynn, through Mrazik and Mrazik's successor, Maureen Hlavacek, did involve himself in the restructuring of Dahm's activities, and for present purposes we shall assume that he did.[1]

Dahm perceived Flynn's actions as a deskilling of her position, culminating in the proposed elimination of her position under a legislative proposal for the creation of the new Wisconsin Gaming Commission. Although Flynn opposed the elimination of

---

1. The changes in Dahm's portfolio of responsibilities began to take place following Dahm's appearance before the Joint Audit Committee of the Wisconsin legislature. Mrazik testified that Dahm's testimony had "an obvious impact" on Flynn (Mrazik Dep. at 192), who found it "disturbing" (*id.*) and was "not pleased" (*id.* at 117).

Mrazik recalled two subsequent conversations taking place in the Spring and Summer of 1991 in which Flynn urged him to supervise Dahm more closely. During one of these conversations, Flynn inquired of Mrazik what he was doing to "control" Dahm. *Id.* at 196. When Mrazik sought guidance as to what he should be

Dahm's position (as well as his own), Dahm left the Lottery and sought other employment. Dahm filed suit against Flynn under 42 U.S.C. § 1983, claiming that Flynn deskilled her position in retaliation for the exercise of her First Amendment right to testify before the JAC. The district court granted summary judgment in favor of Flynn because Dahm had not been sufficiently specific in detailing the adverse actions Flynn took against her, and because the changes in Dahm's responsibilities did not connote demotion or punishment. Dahm now appeals from the district court decision granting summary judgment against her.

## II. Analysis

 We review the decision of the district court to grant summary judgment in favor of Flynn to determine whether, "after drawing all reasonable inferences in favor of the non-moving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Konowitz v. Schnadig Corp.*, 965 F.2d 230, 232 (7th Cir.1992); *see* Fed.R.Civ.P. 56(c). One basis for the decision of the district court was Dahm's lack of specificity in identifying how Flynn retaliated against her. The district court's opinion, however, provides an

excellent summary of what we believe to be reasonably specific allegations of retaliation:

> After her testimony of February 26, plaintiff accompanied Mrazik to only one personnel meeting with Flynn, whereas prior to her testimony she did so once a month; she never met with Flynn alone concerning affirmative action issues, whereas she had met with him once before her testimony; she was excluded from personnel issues involved in the reorganization of the sales division in July 1991 and from involvement with the defense of a pending Fair Labor Standards Act lawsuit; she was removed from the process of filling an attorney position at the lottery; she was prohibited from contacting district sales managers directly concerning the interpretation of work rules, which she had done prior to her testimony; and her roles in handling employee grievances and affirmative action issues were diminished. In addition, Flynn ceased consideration and implementation of a proposed employee handbook in part because Dahm was its author; Mrazik wrote plaintiff memoranda criticizing her performance; and certain personnel work was delegated directly to Dahm's assistant, undermining plaintiff's supervisory role.

---

doing, Flynn told him: "Well, she works for you. You hired her. It's up to you to control her." *Id.* at 196–97. Later, in the Fall of 1991, Mrazik indicated that Flynn told him, "We have to get rid of Cyneth." Mrazik Dep. at 122; see also *id.* at 120. When Mrazik said he didn't think they had grounds to fire Dahm, Flynn suggested that she might be discharged for the pending backlog of reclassification requests or, alternatively, for insubordination. Mrazik balked, which allegedly prompted Flynn to add that "I can't continue to go up to the legislature and have her be there, too." *Id.* at 123. Flynn was concerned, according to Mrazik, that both of them might lose their jobs as a result of Dahm's testimony. *Id.* at 127–28. Flynn vigorously denies having such a conversation with Mrazik; he also denies having instigated any talk of "controlling" Dahm. But according to Dahm, Mrazik's successor as the director of the operations and administration division (and Dahm's supervisor), Maureen Hlavacek, informed Dahm in 1992 that she was perceived as "damaged" (or words to that effect) by her testimony before the legislature. Dahm Dep. at 135; Ex. 49. Hlavacek is the individual that

Dahm asserts took steps to circumvent Dahm and delegate authority to Dahm's assistants. *See id.* at 110–12.

Dahm argues that in light of these conversations, it is reasonable to infer that Flynn was, ultimately, the individual behind the diminution in her responsibilities and the order that she begin to document her phone calls and meetings. We agree that if the conversations following Dahm's legislative testimony took place as Mrazik and Dahm have described them, the factfinder might reasonably conclude that Flynn was responsible for the ensuing changes in Dahm's work assignments. Indeed, Mrazik directed Dahm to begin logging her telephone calls and meetings with other Lottery employees after discussing the need to control Dahm with Flynn, and Mrazik acknowledged that he directed Dahm to do so as a means of "better managing access" to her and "controlling the situation" (albeit for the ostensibly benevolent reason of freeing up more time for her to work on the reclassification requests). Mrazik Dep. at 234, 236. Mrazik also indicated that he informed Flynn he had taken this step. *Id.* at 236.

The district court reasonably found a few of these actions to be trivial, such as not meeting with Flynn regarding affirmative action issues, Dahm having only met with Flynn one time prior to her testimony. Nevertheless, a fairly lengthy list that evidences an erosion of many of Dahm's work responsibilities remains. In fact, with the exception of the processing of reclassification requests, Flynn reassigned nearly all of Dahm's duties. We believe that for the purposes of a motion for summary judgment, one reasonably can infer that there exists a genuine issue of material fact regarding whether Flynn's actions were more than trivial.

The district court also expressed a more fundamental difficulty with Dahm's claim, namely that the shifting nature of Dahm's responsibilities within the confines of her job description cannot be characterized as "a materially adverse change in the terms and conditions of employment...." *Crady v. Liberty Nat. Bank and Trust Co. of Indiana*, 993 F.2d 132, 136 (7th Cir.1993). On one level, we agree with the district court, as this was not an obviously adverse action, such as termination, demotion, or a loss in benefits or salary. *See id.* at 135. Nor did Flynn strip Dahm of all of her duties, leaving her with nothing to do but read a good book—doing so would be adverse for all but those completely devoid of ambition or the need to be challenged. *See id.* at 136 ("significantly diminished material responsibilities" actionable). Rather, Flynn reduced many of Dahm's responsibilities while at the same time greatly increasing her duties regarding the processing of reclassification requests, a qualitative rather than quantitative change.

■ On a deeper level, however, we cannot agree that whether a change in the terms and conditions of employment is materially adverse must be analyzed solely quantitatively. Sometimes job responsibilities can be quite intellectually stimulating, but other duties can be routine at best. Dahm contends that before she testified before the JAC, her job contained a healthy mix of both the former and latter. After she testified, however, Flynn required Dahm to focus exclusively on reclassification requests, which Dahm contended effectively constituted a demotion. We agree that such a dramatic downward shift in skill level required to perform job responsibilities can rise to the level of an adverse employment action, even if the time required to perform the duties remains constant. *See Pieczynski v. Duffy*, 875 F.2d 1331, 1335 (7th Cir.1989) (addressing, among other forms of harassment, "confining [the plaintiff's] duties to monotonous paper work"); *see also Crady*, 993 F.2d at 135 ("A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, *or other indices that might be unique to a particular situation.*") (emphasis added);[2] *Smith v. Fruin*, 28 F.3d 646, 649 n. 3 (7th Cir.1994) ("even minor forms of retaliation can support a First Amendment claim, for they may have just as much of a chilling effect on speech as more drastic measures"). Because there is a question of fact as to whether Flynn's decision to have Dahm exclusively process reclassification requests constituted such a shift in skill level, summary judgment based on the second of the district court's proffered rationales was inappropriate.

■ Nevertheless, we must discuss an issue not reached by the district court, that being whether Flynn enjoys qualified immunity for his actions. Government officials who, acting under color of state law, deprive another of a right, privilege, or immunity secured by the United States Constitution are subject to personal liability for the deprivation. 42 U.S.C. § 1983; *Supreme Video, Inc. v. Schauz*, 15 F.3d 1435, 1438 (7th Cir. 1994). Officials are immune from civil damages, however, if their actions were "objec-

**2.** Although *Crady* contains the dicta that a materially adverse change in the terms and conditions of employment must be more than "an alteration of job responsibilities," that cannot be taken literally to apply to any alteration, no matter how severe. For example, if the duties of an assistant prosecutor were changed from trying cases to sharpening pencils, that change would be materially adverse even if sharpening pencils took as much time as prosecuting cases.

tively reasonable, meaning that [if] 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known,'" they are immune from actions for civil damages. *Id.* at 1438–39 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). We must examine whether it was clearly established that Dahm's testimony before the LAB was protected by the First Amendment guarantee of freedom of speech. U.S. Const. amend. I.

■ Public employees who speak on issues of public concern are protected from their employer taking adverse employment actions against them if the employees' interest in speaking outweighs the government's interest in efficient operations. *Waters v. Churchill,* —— U.S. ——, ——, 114 S.Ct. 1878, 1884, 128 L.Ed.2d 686 (1994); *Connick v. Myers,* 461 U.S. 138, 142, 103 S.Ct. 1684, 1687, 75 L.Ed.2d 708 (1983). Dahm testified before a legislative body, at its request, regarding employee morale at the Lottery, speech that on its face clearly appears to be on a matter of public concern. Although Flynn contends that Dahm's speech was motivated purely by self-interest, *see Yoggerst v. Hedges,* 739 F.2d 293, 295 (7th Cir.1984) (speech not on issue of public concern if motivated by private interests), and was not truthful, *see Pickering v. Board of Educ. of Township High Sch. Dist. 205,* 391 U.S. 563, 574, 88 S.Ct. 1731, 1737–38, 20 L.Ed.2d 811 (1968) (plaintiff's false statements protected absent proof that inaccuracies were knowing or reckless), there exists a genuine issue of material fact as to those points. Flynn is not entitled to qualified immunity at this point in the litigation based on the argument that Dahm's speech did not address an issue of public concern.

■ Flynn also argues that the government interest in efficient operations outweighed Dahm's interest in speaking. *See Pickering,* 391 U.S. at 572–73, 88 S.Ct. at 1736–37. That argument finds little support

in the record before us, however. Not only did Flynn fail to identify how Dahm's testimony impeded the efficient operations of the Lottery, but the precise opposite would seem to have motivated the Wisconsin legislature to invite Dahm to testify—the JAC wanted to hear Dahm's testimony to determine how best to improve efficient operations at the Lottery. The *Pickering* balance would appear to favor Dahm.[3]

■ What is less clear, however, is the extent to which Flynn should have known that his retaliation against Dahm constituted adverse employment action. Although we in this case hold that decreasing some job responsibilities while increasing other duties can, under limited circumstances, constitute an adverse employment action, no case in our circuit previously had addressed that precise issue. A few of our cases hinted that gutting central job functions may constitute an adverse action, but these cases addressed quantitative rather than qualitative reductions in responsibilities. *Crady,* 993 F.2d at 136; *Pieczynski,* 875 F.2d at 1335. Because it was not clearly established at the relevant time that qualitative reductions in job responsibilities, without discharge, transfer, demotion, or salary loss, could constitute an adverse employment action, Flynn is immune from civil damages regarding his rearrangement of Dahm's duties. *See Greenberg v. Kmetko,* 922 F.2d 382, 385 (7th Cir.1991) (public officials "need not predict [the law's] evolution, need not know that in the fight between broad and narrow readings of a precedent the broad reading will become ascendant.").

■ Nevertheless, we cannot yet hold that Flynn is completely immune from damages. The district court noted that Flynn began requiring Dahm to document her daily phone calls and meetings, and delegated "certain personnel work ... directly to Dahm's assistant, undermining plaintiff's supervisory role." We have indicated both that subjecting employees to harassment, *Bart v. Telford,* 677 F.2d 622, 625 (7th Cir.1982), and

---

**3.** In August 1991, Dahm wrote a memorandum to Flynn and the JAC asserting that the Lottery had not acted to correct the morale problem and that employee spirit continued to decline. We leave it to the district court on remand to consid-

er, if need be, whether the government's interest in efficient administration outweighed Dahm's First Amendment interest in voicing the opinions expressed in that memorandum.

terminating supervisory authority over other employees, *Pieczynski*, 875 F.2d at 1335–36, are adverse employment actions. Because factual issues remain as to whether Flynn's decision to have Dahm document her phone calls and meetings and his undermining of Dahm's supervisory role fit into either of these categories, the district court is better suited to determine whether Flynn is entitled to qualified immunity for those actions.

### III. Conclusion

Flynn enjoys qualified immunity for his decision to reorganize Dahm's job responsibilities. However, the existence of genuine issues of material fact regarding the undermining of Dahm's supervisory role and making Dahm log her daily activities precludes a finding of immunity at this stage of the litigation. The district court is the appropriate forum for resolving the factual questions concerning these acts and assessing whether Flynn is entitled to qualified immunity for them.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

EASTERBROOK, Circuit Judge, dissenting in part.

Dahm said that employees were disgruntled because of delay in reclassifying jobs. Flynn, her superior, told Dahm to spend more time on reclassifications, which she found tedious compared with other tasks such as completing a personnel manual. Without deciding whether Dahm's speech was protected by the first amendment under the standard of *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), the district court held that the new allotment of tasks had not violated the Constitution. Reshuffling responsibilities within a bureaucracy is common. The district court concluded that it would not have discouraged a reasonable person from speaking—and it is undisputed that it did not discourage Dahm from speaking.

Like the district court, I find it hard to perceive a constitutional problem in assigning tasks to one employee rather than another, unless the first amendment appoints the federal judiciary as a civil service commission

for the entire nation. Ombudsmen would be a better description, for most civil service laws do not regulate the allocation of work when the supervisor's directives do not affect salary, position, station, or even perquisites. The Merit System Protection Board does not review matters of the kind Dahm seeks to litigate. 5 C.F.R. § 1201.3(a). Can it be that the Constitution compels full-dress adjudication of claims too trivial for the attention of a specialized administrative adjudicator?

My colleagues agree with the district court in large measure and do not disagree with its ultimate conclusion. In particular, they do not hold that Dahm's speech was protected by the first amendment or that Flynn's reallocation of responsibilities was designed to (or did) punish that speech. They believe that more evidence, more hearings, more consideration are appropriate to get this exactly right. Maybe so, if fine tuning of the constitutional issue were essential. Some of our cases do say that even trivial annoyances may violate the first amendment. These decisions may bear reexamination, see *Walsh v. Ward*, 991 F.2d 1344 (7th Cir.1993); *Wilbur v. Mahan*, 3 F.3d 214 (7th Cir.1993) (concurring opinion), but they represent the law of the circuit. But to get this far—to say that the merits of the constitutional claim remain murky even after one decision by the district court and consideration on appeal—is to show that Flynn is entitled to immunity. The district judge believed that Flynn wins on the merits. A majority of this panel thinks that the matter is obscure. *None* of the four judges who has inquired into these events is willing to say that there is a constitutional problem. Why, then, should there be more litigation on damages?

Equivocation by the judges who have examined this situation is the best proof of legal uncertainty, and legal uncertainty confers immunity. Until the right in question has been "clearly established," courts do not demand that public officials dig into their pockets. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Officials performing discretionary functions are immune from damages liability "as long as their actions could reasonably have been thought consistent with the rights

they are alleged to have violated." *Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987), citing *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986). See also *Hunter v. Bryant,* 502 U.S. 224, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991); *Rakovich v. Wade,* 850 F.2d 1180, 1208–09 (7th Cir.1988) (en banc). The history of this litigation establishes that Flynn "could reasonably have ... thought [his acts] consistent with the rights they are alleged to have violated."

One might say in response that *Pickering* itself "clearly established" the rights in question. But *Pickering* set up a balancing approach, and a call for "balancing" does not establish anything "clearly," or at all. Judges applying *Pickering* inquire how far the speech touches on issues of public concern, and how disruptive the speech may have been in the workplace. There is no metric for either of these inquiries, let alone a scale for weighing the two incommensurable answers. *Pickering* thus establishes a cast of mind, not a legal rule. An abstraction does not establish the unconstitutionality of a concrete act.

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent.

*Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039 (citations omitted). How could anyone say that the unlawfulness of his deeds must have been apparent to Flynn, a non-lawyer, when with the benefit of hindsight and full reflection a federal district judge found that Flynn's acts were *not* unlawful?

Bureaucrats and district judges are not the only persons who have found the *Pickering* balance elusive. *Waters v. Churchill,* —— U.S. ——, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994), the Supreme Court's latest encounter with *Pickering,* generated four opinions, none commanding a majority. Justice O'Connor, who wrote the lead opinion, conceded that *Pickering* had not yet gelled into a legal rule. "We must therefore reconcile ourselves to answering the question on a case-by-case basis, at least until some workable general rule emerges." —— U.S. at ——, 114 S.Ct. at 1886. All the Court has been able to do is to suggest criteria. Some of these criteria are pertinent to Flynn's actions and strongly support them (*id.* —— – ——, 114 S.Ct. at 1887–88):

> Agencies hire employees to help do those tasks as effectively and efficiently as possible. When someone who is paid a salary so that she will contribute to an agency's effective operation begins to do or say things that detract from the agency's effective operation, the government employer must have some power to restrain her. The reason [a] governor [may fire a deputy who speaks out in public] is not that this dismissal would somehow be narrowly tailored to a compelling government interest. It is that the governor and the governor's staff have a job to do, and the governor justifiably feels that a quieter subordinate would allow them to do this job more effectively.

> The key to First Amendment analysis of government employment decisions, then, is this: The government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer. The government cannot restrict the speech of the public at large just in the name of efficiency. But where the government is employing someone for the very purpose of effectively achieving its goals, such restrictions may well be appropriate.

Flynn's bureau had a job to do. He believed that its tasks could best be done if Dahm spent less time talking and more time on reclassification requests. Perhaps he was wrong, but no one could say that he violated a "clearly established" rule.

We have long recognized that damages are inappropriate in *Pickering* cases. Our court made the essential point in *Benson v. All-*

*phin*, 786 F.2d 268, 276 & n. 17 (7th Cir.1986) (citations and footnotes omitted):

> [T]here is one type of constitutional rule, namely that involving the balancing of competing interests, for which the standard may be clearly established, but its application is so fact dependent that the "law" can rarely be considered "clearly established." In determining due-process requirements for discharging a government employee, for example, the courts must carefully balance the competing interests of the employee and the employer in each case. Thus, the Supreme Court has consistently stated that one can only proceed on a case-by-case basis and that no all-encompassing procedure may be set forth to cover all situations.... It would appear that, whenever a balancing of interests is required, the facts of the existing caselaw must closely correspond to the contested action before the defendant official is subject to liability under *Harlow*. With *Harlow*'s elimination of the inquiry into the actual motivations of the official, see 457 U.S. at 815–19 [102 S.Ct. at 2736–39], qualified immunity typically casts a wide net to protect government officials from damage liability whenever balancing is required.
>
> n.17 Government officials must be granted the ability to pass unmolested through bogs of murky legal precedent. They must not become prey to every hypothesis of what the law might have come to forbid had it eventually developed along certain lines. When the law is clear, and an official's duties delineated, then he will not be able to rely on the immunity defense. But we must not and do not demand that every government official become skilled in guessing the future path of the law.

A chain of cases since then has emphasized that *Pickering* claims, because of the balancing involved, are singularly inappropriate for awards of damages. E.g., *Rakovich*, 850 F.2d at 1213; *Feldman v. Bahn*, 12 F.3d 730, 733 (7th Cir.1993); *Walsh*, 991 F.2d at 1346; *Elliott v. Thomas*, 937 F.2d 338, 343 (7th Cir.1991); *Greenberg v. Kmetko*, 922 F.2d 382, 384–85 (7th Cir.1991). See also *Zook v. Brown*, 748 F.2d 1161 (7th Cir.1984). The principle behind these decisions is equally applicable today.

It can't create a constitutional problem, let alone violate a "clearly established" right, for a supervisor to reshuffle tasks after an employee has talked about organization and management; *every* employee in a bureaucracy does this incessantly. Supervisors find it safe to do nothing, to let the subordinates have their way rather than invest the time (and take the risk) necessary to improve matters. That is why "bureaucracy" has become a term of opprobrium. Threatening personal liability for action in the shadow of legal uncertainty—for guessing wrong about a subject that perplexes federal judges—can only make things worse.

Official immunity includes entitlement to avoid the travail of litigation. *Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). Flynn defends his judgment on the basis of immunity, as he is entitled to do. *Massachusetts Mutual Life Insurance Co. v. Ludwig*, 426 U.S. 479, 96 S.Ct. 2158, 48 L.Ed.2d 784 (1976); *Jordan v. Duff & Phelps, Inc.*, 815 F.2d 429, 439 (7th Cir.1987). The question has been fully briefed. The Supreme Court "repeatedly [has] stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter*, 502 U.S. at 227, 112 S.Ct. at 536. My colleagues do not heed this instruction, remanding for supererogatory proceedings when a decision can be made now. Discovery is over, and we are long past the time when a decision on immunity should be taken. Why put litigants, counsel, and judge through an exercise that can have only one outcome?