**Jessica ANDERSEN, Plaintiff,**

v.

**O. Lane McCOTTER, in his official capacity as Director of the Utah Department of Corrections, et al., Defendants.**

**No. CIV. 94–CV–372 B.**

United States District Court,
D. Utah,
Central Division.

April 2, 1998.

---

Ross Anderson, Nathan Wilcox, Salt Lake City, UT, for Plaintiffs.

Elizabeth King, John West, Salt Lake City, UT, for Defendants.

## MEMORANDUM OPINION AND ORDER

BENSON, District Judge.

### I. Introduction

In 1994, Plaintiff Jessica Andersen was a student intern at Bonneville Community Correctional Center (Bonneville), a half-way house for sex-offenders under the jurisdiction of the Utah Department of Corrections (DOC). After serving approximately 6 months in her part-time capacity as an intern, Ms. Andersen was approached by a television reporter from KTVX television, Salt Lake City's ABC affiliate, about giving an interview regarding a proposed policy change in the way treatment would be provided to sex-offenders at Bonneville. Without prior approval from her Department, Ms. Andersen agreed to give the interview in which she offered her view that the proposed policy change would drastically reduce the quality and quantity of the treatment given to potentially dangerous sex-offenders and that the change could result in the premature release of these offenders into the communi-

ty. The interview appeared on the air on March 8, 1994. Andersen's statements were inaccurate and misleading. At the time of the television broadcast the proposed policy change had been discussed within the Department of Corrections but had not yet been finalized or made public. Upon learning of Andersen's televised statements, Defendants terminated her internship with Bonneville.

. Andersen filed suit under 42 U.S.C. § 1983, claiming that Defendants fired her for expressing her opinion on a matter of public concern, and thereby violated her First Amendment rights.

## II. First Amendment Restrictions on Public Employers' Interference With Employee Speech

■ Recognizing that the First Amendment protects a government employee's right to comment on matters of public concern, modern courts have rejected Justice Holmes' observation that a while a policeman "may have a constitutional right to talk politics," "he has no constitutional right to be a policeman." *McAuliffe v. Mayor of New Bedford,* 155 Mass. 216, 29 N.E. 517 (1892). Under the constitutional standard set out in *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) and its progeny, a government employer may deny the benefit of employment to an employee for speaking out against her employer on a matter of public concern only if the employer can show that such speech adversely affects the effectiveness of the employer's operations, and that the government's interests, as an employer, outweigh the individual employee's interest in the precipitating speech.

■ The reasoning employed in *Pickering* has evolved into a four-part test. First, the terminated employee must demonstrate that her speech involved a matter of public concern. *See e.g., Board of County Commissioners v. Umbehr,* 518 U.S. 668, 116 S.Ct. 2342, 2347–48, 135 L.Ed.2d 843 (1996). Second, the employee must show that the speech in question was a "substantial or motivating factor in [her] termination." *Id.* Third, "[i]f the employee discharges that burden, the government can escape liability by showing that it would have taken the same action" in the absence of the speech. *Id.* Fourth, "even

termination [resulting from] protected speech may be justified" when the government's interests in " 'promoting the efficiency of the public services it performs through its employees" outweigh the employee's interests in " 'commenting on matters of public concern.' " *Id.* (quoting *Pickering,* 391 U.S. at 568). Steps one and four are considered mixed questions of law and fact, and are therefore decided by the Court, while steps two and three are questions of fact. *See Andersen,* 100 F.3d at 728.

Because the outcome of the *Pickering* balancing test is, by nature, quite fact specific, it is helpful to review four of the most well-known cases in which the Supreme Court has applied it. Analyzing the factors considered in each case, and the respective weight the Court gave those factors may clarify the somewhat muddy waters surrounding the application of *Pickering. See e.g., Pickering,* 391 U.S. at 569 ("Because of the enormous variety of fact situations in which critical statements by . . . public employees may be thought by their superiors . . . to furnish grounds for dismissal, we do not deem it either appropriate or feasible to lay down a general standard against which all such statements may be judged.").

### A. *Pickering v. Board of Education*

The *Pickering* case itself arose after Marvin Pickering, an Illinois public school teacher, was fired for sending a letter to a local newspaper applauding the failure of a proposed tax increase which the board of education had submitted to the voters, and criticizing the school board and superintendent for their handling of the proposal. *Pickering,* 391 U.S. at 564–66.

Pickering brought suit in Illinois state court, alleging that the school board had violated his First Amendment rights to free speech. The trial court affirmed the school board's decision, finding that Pickering's letter was detrimental to the interests of the school system, and that the interests of the schools outweighed Pickering's First Amendment rights. *Id.* On appeal, the Illinois Supreme Court affirmed. *Id.*

The United States Supreme Court reversed, holding that Pickering's First Amendment rights had been violated. In balancing the interests of the school district with Pickering's countervailing interest in free speech, the Court took a number of factual and legal considerations into account. The Court concluded that since (1) the statement did not "impede[ ] the teacher's proper performance in the classroom or ... interfere with the regular operation of the schools generally," *id.* at 572; (2) the teacher's employment was "only tangentially and insubstantially involved in the subject matter" of the speech that led to his termination, *id.* at 574; (3) the teacher's "employment relationships with [his superiors]" were "not the kind of close working relationships for which it can persuasively be claimed that personal loyalty and confidence are necessary to their proper functioning," *id.* at 570; (4) the teacher's statement presented no "question of maintaining either discipline by immediate superiors or harmony among coworkers," *id.* at 570; (5) the situation was not one "in which a teacher ha[d] carelessly made false statements about matters so closely related to the day-to-day operations of the schools that any harmful impact on the public would be difficult to counter because of the teacher's presumed greater access to the real facts," *id.* at 572; (6) the issue addressed in the teacher's letter was not determined by the teacher's superiors, but by popular vote, *id.* at 571; (7) "free and open debate is vital to informed decision-making by the electorate," *id.* at 571–72; and (8) "the interest of the school administration in limiting teachers' opportunities to contribute to public debate is not significantly greater than its interest in limiting a similar contribution by any member of the general public," *id.* at 573; the school board's decision to terminate the teacher was unwarranted.

■ *Pickering* stands for the principle that where the implicated employee speech addresses a matter of broad public concern (for example, a proposed tax increase to be decided by general vote), and where the impact of the speech cannot be shown to hinder the effectiveness of the government workplace in a significant way, the implicated employee speech cannot be cause for termination of employment.

### B. *Connick v. Myers*

*Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), arose after Sheila Myers, an assistant district attorney, was transferred to a different section of the district attorney's office. *Id.* at 140. Disgruntled about the transfer, she expressed her grievances with two of her supervisors, one of whom told her that her coworkers did not share her concerns. *Id.* at 141.

Determined to "do some research on the matter," Myers prepared a questionnaire that she distributed to fifteen of her fellow assistant district attorneys. The questionnaire inquired into her coworkers' feelings about "office transfer policy, office morale, the need for a grievance committee, the level of confidence in supervisors, and whether employees felt pressured to work in political campaigns." *Id.*

After learning about the questionnaire, Myers' supervisors informed her that her employment was being terminated; not only for her unwillingness to accept her transfer, but also because the distribution of her questionnaire created a " 'mini-insurrection,' " and amounted to "an act of insubordination." *Id.*

Myers brought suit under 42 U.S.C. § 1983, claiming that she had been wrongfully terminated for exercising her First Amendment free speech rights. The district court found that the questionnaire involved a matter of public concern, that Myers was fired because of it, and that the defendants had not shown how the questionnaire interfered with the operations of the district attorney's office. *Id.* Accordingly, the court ordered Myers reinstated and awarded her back pay, damages, and attorney's fees. *Id.* The United States Court of Appeals affirmed the decision on appeal. *Id.*

The Supreme Court reversed, finding that Myers' supervisors "did not offend the First Amendment" by terminating her employment. *Id.* The Court specifically emphasized the following factors: (1) Myers' supervisors concluded that the survey constituted "an act of insubordination which interfered with

working relationships," *id.* at 151–52; (2) "a wide degree of deference to the employer's judgment is appropriate" whenever "close relationships are essential to fulfilling public responsibilities," *id.*; (3) the First Amendment does not require employers to "allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action," *id.*; (4) the survey "touched upon matters of public concern in only a most limited sense," *id.* at 154; (5) the survey "is most accurately characterized as an employee grievance concerning internal office policy,"[1] *id.*; and (6) "additional weight must be given to the supervisor's view that the employee has threatened the authority of the employer to run the office" whenever "employee speech concerning office policy arises from an employment dispute concerning the very application of that policy to the speaker" *id.* at 153.

At first glance, *Connick* may appear inconsistent with *Pickering*. However, a closer look reveals that the reasoning employed in the two cases is entirely consistent; significant factual differences simply demanded that the Court reach a different result in *Connick*. Unlike Marvin Pickering, Sheila Myers "spoke out" on the internal office procedures and policies of her employer (a matter of relatively limited public concern), and did so in a workplace where employee harmony and discipline was considered essential.

### C. *Rankin v. McPherson*

Ardith McPherson was a data-entry employee in a county law enforcement office in Texas. *Rankin v. McPherson*, 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987). On March 30, 1981, upon hearing of the unsuccessful assassination attempt on President Ronald Reagan, McPherson exclaimed "[S]hoot, if they go for him again, I hope they get him." *Id.* at 381. Unfortunately for McPherson, her supervisor overheard the statement, whereupon he promptly terminated her employment. *Id.* at 382.

McPherson brought suit under 42 U.S.C. § 1983, claiming that her supervisor had violated her constitutional rights by firing her. The district court granted summary judgment in favor of the defendant, holding that McPherson's speech was not entitled to constitutional protection. *Id.* The United States Court of Appeals for the Fifth Circuit vacated and remanded for trial, holding that substantial issues of material fact regarding the context in which McPherson made the statement precluded summary judgment. 736 F.2d 175 (5th Cir.1984).

On remand, the district court again held that McPherson's statements did not constitute protected speech. The Court of Appeals reversed a second time, holding that McPherson had addressed a matter of public concern in making her statement. The Court of Appeals also performed the *Pickering* balancing test, and concluded that the government's interest in maintaining discipline in the work place did not outweigh McPherson's interest in free speech.

The Supreme Court affirmed the Court of Appeals' ruling. The Court first concluded that the statement addressed a matter of public concern because it "was made in the course of a conversation addressing the policies of the President's administration." *Id.* at 386.

In balancing McPherson's interests in making the statement with the defendant's interests, the Court noted that (1) there was no "danger that McPherson had discredited the office by making her statement in public," *id.* at 389; (2) "McPherson's speech took place in an area in which there was ordinarily no public access" and was "made in a private conversation with another employee," *id.*; (3) McPherson's discharge was not related to the functioning of her workplace, *id.*; (4) the firing "was not based on an assessment by [her employer] that the remark demonstrated a character trait that made her unfit to perform her work," *id.*; and (5) McPherson did not serve in a "confidential, policy mak-

---

**1.** The Court explained why employee grievances are provided less protection in the closing paragraph of the opinion, concluding that "it would be a Pyrrhic victory for the great principles of free expression if the [First] Amendment's safe-

guarding of a public employee's right, as a citizen, to participate in discussions concerning public affairs were confused with the attempt to constitutionalize the employee grievance that we see presented here." *Connick*, 461 U.S. at 154.

ing, or public contact role," so the "danger to the [office's] successful functioning from [her] speech [was] minimal," *id.* at 390–91. Accordingly, McPherson's termination was constitutionally impermissible. *Id.* at 392.

## D. *Waters v. Churchill*

In *Waters v. Churchill,* 511 U.S. 661, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994), the Supreme Court clarified the evidentiary standard government employers must employ in making a free speech-based termination decision. The case arose after Cheryl Churchill, a nurse at a government-run hospital, was terminated for making allegedly critical comments about her supervisors to several co-workers. *Id.* at 1882. Churchill admitted making a few of the statements that led to her dismissal, but denied making many of the more critical comments. She filed suit under 42 U.S.C. § 1983, claiming that, even if she had made all of the statements attributed to her, the speech resulting in her dismissal was protected by the First Amendment. *Id.* at 1883.

The district court granted summary judgment for the defendants, holding that, regardless of whose story was correct (Churchill's or defendants'), Churchill did not have a valid cause of action because the speech in question did not deal with a matter of public concern and, therefore, was not entitled to constitutional protection. *Id.* In the alternative, the district court found that, even if the speech did address a matter of public concern, it was sufficiently disruptive to preclude constitutional protection. *Id.*

The United States Court of Appeals for the Seventh Circuit reversed the district court's holding. 977 F.2d 1114 (7th Cir. 1992). That court found that Churchill's comments touched upon a matter of public concern because they called into question "the quality and level of nursing care [that the hospital] provide[d] its patients," and were not disruptive. *Id.* at 1124. The court also explained · that the critical inquiry was not what the defendants thought Churchill had said when they decided to fire her, but rather what she actually said. *Id.*

The Supreme Court reversed the Seventh Circuit's ruling. In a plurality opinion [2] authored by Justice O'Connor, the Court concluded that as long as the government employer makes reasonable efforts to sort out the facts behind the employee's statement, the fact that the employer's conclusions may later be proven factually inaccurate or incomplete is irrelevant. *Waters v. Churchill,* 114 S.Ct. at 1884–1890. The Court emphasized that the employer's understanding of the facts must be reasonable, and that in some circumstances (where the validity of accusations brought against the employee are in doubt), the employer should make a reasonable inquiry [3] into the validity of the accusations before taking action against the accused employee. *Id.*

The Court also emphasized the need to give government employers' reasonable perceptions of potential harm a certain amount of deference, explaining that

> [E]mployers, public and private, often do rely on hearsay, on past similar conduct, on their personal knowledge of people's credibility, and on other factors that the

**2.** Justice Scalia filed an opinion concurring in the judgment, in which Justices Kennedy and Thomas joined. Justice Stevens filed a dissenting opinion, in which Justice Blackmun joined.

**3.** The Court provided some guidance as to how such an inquiry could be carried out, explaining that

> If an employment action is based on what an employee supposedly said, and a reasonable supervisor would recognize that there is a substantial likelihood that what was actually said was protected, the manager must tread with a certain amount of care. This need not be the care with which trials, with their rules of evidence and procedure, are conducted. It should, however, be the care that a reasonable

> manager would use before making an employment decision—discharge, suspension, reprimand, or whatever else—of the sort involved in the particular case.
>
> Of course, there will often be situations in which reasonable employers would disagree about who is to be believed, or how much investigation needs to be done, or how much evidence is needed to come to a particular conclusion. In those situations, many different courses of action will necessarily be reasonable. Only procedures outside the range of what a reasonable manager would use may be condemned as unreasonable.
>
> *Id.* at 1889.

judicial process ignores. Such reliance may sometimes be the most effective way for the employer to avoid future recurrences of improper and disruptive conduct. What works best in a judicial proceeding may not be appropriate in the employment context. If one employee accuses another of misconduct, it is reasonable for a government manager to credit the allegation more if it is consistent with what the manager knows of the character of the accused. Likewise, a manager may legitimately want to discipline an employee based on complaints by patrons that the employee has been rude, even though these complaints are hearsay.

*Id.* at 1890.

Finally, the *Waters* Court concluded that "[e]ven if Churchill's criticism ... was speech on a matter of public concern—something we need not decide—the potential disruptiveness of the speech as reported was enough to outweigh any First Amendment value it might have had." *Id.* at 1890. Since the defendants reasonably believed statement "threatened to undermine management's authority," and since Churchill's speech dealt almost completely with the internal affairs of her workplace, defendants were justified in taking action. *Id.*

Read together, *Pickering, Connick, McPherson,* and *Waters* provide valuable insight into what factors are to be considered in balancing an employee's interest in speech with a government employer's interest in restricting that speech. Most significantly, they show that a plaintiff's interest in commenting on a matter of public concern is directly proportional to the magnitude of the public concern involved. By the same token, these cases also show that the government's interest in restricting the plaintiff's speech is directly proportional to (1) the importance of employee harmony and discipline in the government agency in question, and (2) the extent to which the employer reasonably concludes that the plaintiff's speech threatened employee harmony and discipline.

### III.  Factual Background

Plaintiff Jessica Andersen is a thirty-seven year-old citizen of New Zealand, currently residing in Canada. Accompanied by her then-husband and three children, she moved to Utah from Australia in 1989. She divorced in 1990, and was left with no means of support. Determined to make a difficult situation better, she decided to obtain a college degree that would enable her to support her young family. She eventually obtained degrees from LDS Business College and Weber State University.

As a single mother, Jessica encountered great difficulty supporting her family while in school. Her student visa did not permit her to work in the United States. However, she was allowed to receive wages for any work she performed in direct furtherance of her education.

She was therefore elated when, on October 14, 1993, she obtained a paid internship with the Utah Board of Pardons. Not only did the internship entitle her to receive college credit toward her course work in Psychology and Criminal Justice at Weber State University, it also gave her the opportunity to receive wages without violating her student visa. The Board of Pardons paid her six dollars per hour for up to twenty hours of work per week.

Less that one month later, while continuing to serve her internship with the Board of Pardons, she contacted personnel at the Bonneville Community Correctional Center (Bonneville), a residential sex-offender facility managed by the Utah Department of Corrections (DOC). Andersen was successful in arranging an unpaid internship at Bonneville. She received permission from the Board of Pardons to engage in this second internship, which she performed on her own time. While she performed her internship at Bonneville, she continued to work in excess of twenty hours per week at the Board of Pardons.

Andersen claims that the Board of Pardons agreed to credit the hours she worked at Bonneville toward the wages and college credit she received for her work at the Board of Pardons. Defendants deny this assertion, claiming that while the Board of Pardons did not forbid Andersen from working at Bonneville on her own time, the Board of Pardons

never credited Ms. Andersen's work at Bonneville toward her wages or college credit. Defendants also point out that, even if Andersen initially had been paid by the Board of Pardons for her work at Bonneville, her wages ceased in February 1994, when her internship at the Board of Pardons ended. The incidents giving rise to this action occurred in March, 1994.

Before she began her internship at Bonneville, Andersen was required to receive orientation training and instruction from Kathy Ockey, Bonneville's volunteer coordinator. During Andersen's orientation meeting, Ockey discussed DOC policies as explained in the DOC Code of Conduct, pointing out that for public safety reasons, all DOC personnel, including volunteers, are required to abide by those policies. Specifically, Ockey explained that inmates (particularly sex-offenders) sometimes react irrationally or unpredictably to information bearing upon their incarceration or treatment, and that the DOC has a duty to protect the public from the harm that could result from such a reaction by controlling information that is released to inmates (1) directly or (2) indirectly through the news media or another third party. At the end of the orientation meeting, Andersen signed a Volunteer Agreement in which she agreed to abide by all DOC policies.

Andersen enjoyed her work at Bonneville, which lasted approximately five months. She developed an understanding of how Bonneville was administered. Initially, she spent most of her time performing clerical tasks (making copies, filing papers, etc.). She was given access to sensitive information regarding the inmates and the facility itself.

Dr. Stephen Kramer, director of inmate treatment at Bonneville (also Andersen's supervisor), took notice of Andersen's abilities, and began giving her more meaningful responsibilities. Under Dr. Kramer's supervision, Andersen conducted group therapy sessions and sometimes met with offenders on an individual basis when Dr. Kramer was unavailable. Kramer expressed confidence in Andersen, calling her the best intern he had ever worked with. He also made it known that he intended to find a way for her to continue working at Bonneville indefinitely.

These circumstances created a bright employment outlook for both Andersen and Kramer. Kramer had a valuable and needed assistant in Andersen, while Andersen had the opportunity to obtain valuable work experience in her chosen field in an internship that had the potential to evolve into a permanent wage-earning position.

That outlook changed in early 1994 when Andersen and Kramer (along with other DOC personnel) learned that the DOC was considering making changes in the sex-offender treatment program. The Department was considering using independent contractors, rather than internal personnel, to provide certain forms of treatment to Bonneville's sex-offender inmates. By contracting with private treatment providers, the DOC hoped that Bonneville could provide sex-offenders with more treatment without dramatically increasing costs.

At the time Andersen was working at Bonneville, the DOC had not reached a final decision on the proposed changes. Although DOC officials were relatively certain that Bonneville would be changing treatment providers, they wanted to postpone any formal announcement until the decision had become final and the details were worked out. DOC officials feared that a premature announcement of the proposed changes would unnecessarily upset Bonneville's inmates, and make them less responsive to their current treatment providers. As of early March, 1994, the only information that Bonneville inmates had about the proposed changes came from unconfirmed rumor.

Dr. Kramer was adamantly opposed to the proposed changes. He argued that inmates would receive inferior, or otherwise insufficient, treatment from independent contractors. After having several conversations on the subject with Kramer, Andersen too became critical of the proposed changes.

Both Kramer and Andersen had more at stake than their professional concern for quality control in Bonneville's treatment program. Kramer admitted that he had a strong personal stake in the matter, noting

that the proposal called for the elimination of his current position. Vicariously, Andersen also had a personal stake in the matter. Her plans to continue working at Bonneville were largely centered around, and contingent upon, her work with Kramer.

In February 1994, Mary Sawyers, a reporter for KTVX Television (Salt Lake City's ABC affiliate), received some information about the proposed changes. She contacted Dr. Kramer, and asked him if he would be willing to express his opinion about the proposed changes in an interview with KTVX. Dr. Kramer declined the interview, informing Sawyers that DOC policies forbade him from making public comment on the matter.

Hoping to find an inside, non-anonymous source, Sawyers continued to search for any Bonneville employee who might be willing to comment on the proposed changes. Acting on a tip from an unidentified Bonneville employee, Sawyers contacted Andersen at her home (by telephone), and asked Andersen if she would consent to an interview. Andersen consented.

During the resulting interview, which was televised March 8, 1994, on KTVX Television's evening news, airing at 6:00 pm and 10:00 pm, Andersen voiced her opinions about the proposed changes, expressing concern that the changes would drastically reduce the quality and quantity of treatment that Bonneville inmates receive, and could result in the premature release of potentially dangerous sex-offenders. In the portion of the interview that was broadcast on KTVX Television, Andersen concluded that "The treatment time will be cut severely, and the effectiveness of the treatment on the parolee will not be as good as it is now, which will increase the risk to the public." Plaintiff's Exhibit 2.

Andersen argues that she confined her comments to the expression of her own opinion, claiming that she did not attempt to speak as a representative of the DOC or Bonneville. Defendants disagree, asserting that Andersen appeared to be speaking on behalf of the DOC, that the written caption accompanying her television statement identified her as a Bonneville volunteer, and that she presented her views of the proposed changes as a member of Bonneville's staff, not as a concerned private citizen.

Defendants also point out that the DOC had not yet released any information on the proposed changes, and that Andersen's premature statement was not only unauthorized, but also grossly inaccurate. Although Andersen wanted the public to believe otherwise when she made her statement, the DOC had never considered a proposal that would have reduced treatment time. By all accounts, switching to private treatment providers was intended to allow (and in fact did allow) Bonneville to provide sex-offenders with more treatment time.

Defendants claim that by her premature, unauthorized and inaccurate television news interview, Andersen jeopardized the security and effectiveness of the Bonneville facility. Defendants believed that when Andersen made the statement, she rendered ineffective the Department's plan to discuss the proposed changes with staff and inmates cautiously and accurately before releasing any information to the public. This plan, Defendants explain, was not part of a public relations scheme; it was a precautionary measure mandated by legitimate security concerns. Bonneville inmates have been known to react violently when informed of drastic changes in their treatment regimen.

A number of Bonneville employees and DOC administrators saw Andersen's statement on the evening news, and immediately became concerned. Their fears were heightened when they learned that several inmates had also seen Andersen on the KTVX news report, and were angered by her statement.

As word of Andersen's statement spread among the inmates the Bonneville staff immediately increased security measures, and took other steps to ensure that the controversy that the statement had created did not evolve into a significant public safety concern. Andersen's superiors also determined that under the circumstances, Andersen could not be allowed to continue working as a volunteer student intern at Bonneville. Among other things, her superiors feared that Andersen, who by virtue of her position had been given access to sensitive informa-

tion about the facility and its inmates, could not reasonably be trusted to treat that information in a manner appropriate to the security needs of the Center.

On March 9, 1994, Andersen was informed that her internship was being terminated because she had violated her Volunteer Agreement. Andersen's Volunteer Agreement did not, on its face, prohibit criticizing the DOC, but incorporated the DOC Code of Conduct by reference. The Code of Conduct requires all DOC personnel to receive permission before making a press release, and also provides that

> No [employee] shall act or behave privately or officially in such a manner that undermines the efficiency of the Department, causes the public to lose confidence in the Department, or brings discredit upon himself, the State of Utah or the Department.... Members shall not make critical or disloyal public remarks about any policy, procedure, official act, or other member of the Department, nor gossip about the internal affairs of the Department.

Utah Department of Corrections, Code of Conduct, § AE02/03.01,.06, Plaintiff's Exhibit 5.

Although the dismissal did not hinder her progression toward graduation in any way, Andersen felt that she had been wronged, and became determined to make her objections known. Armed with a concealed tape recorder, Andersen argued with her two of her superiors in two separate "exit interviews" in an attempt to reveal and memorialize the alleged impropriety of the termination. Andersen's superiors told her that the decision was justified by security concerns, and denied Andersen's accusations they had violated her rights as a volunteer.

Andersen filed suit under 28 U.S.C. § 1983, alleging that Defendants violated her constitutional rights when they fired her for making the statement. She claims that her statement constituted speech on a matter of public concern, and is therefore entitled to First Amendment protection.

Defendants moved for summary judgment, claiming that they were protected by qualified immunity. Specifically, Defendants ar-

gued that Ms. Andersen's status as a volunteer controlled the issue, and that the law was not clearly established that volunteers were afforded the same First Amendment protection as paid employees.

This Court granted Defendants' Motion for Summary Judgment. In the first part of the two-part qualified immunity analysis, the Court concluded that Ms. Andersen's constitutional rights were not violated, and therefore did not reach the second step in the qualified immunity analysis. In reaching this determination, the Court attempted to apply the balancing test set forth in *Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), weighing Ms. Andersen's interest in commenting upon matters of public concern against the DOC's interest, as a government employer, in promoting the efficiency and security of the public services it performs.

On appeal, Andersen claimed that her position with the DOC was a valuable governmental benefit which could only be denied in a manner that comports with the protections of the First Amendment. Therefore, she was entitled to the same protection under *Pickering* as any employee. In addition, she argued that this Court improperly granted summary judgment because it improperly performed the *Pickering* balancing test. Finally, she claimed that the law was clearly established in this area, thereby precluding Defendants' claims of qualified immunity.

The United States Court of Appeals for the Tenth Circuit agreed with Andersen, and reversed this Court's Order granting summary judgment. *Andersen v. McCotter,* 100 F.3d 723 (10th Cir.1996). Specifically, the Court of Appeals held that Defendants did not provide the Court with "evidence sufficient to assess the character and weight of the DOC's interest." *Id.* at 729.

The Court of Appeals also concluded that Defendants were not entitled to qualified immunity because "[t]he law has been clearly established since 1968 that public employees may not be discharged in retaliation for speaking on matters of public concern, absent a showing that the government employer's interest in the efficiency of its operations outweighs the employee's interest in the

speech." *Id.* This conclusion was based upon the Court of Appeals' finding that "Ms. Andersen was not a volunteer," but rather "a public employee who was paid by the State of Utah." *Id.*

The case came for trial before the Court on January 5, 1998, and continued until January 8, 1998. Plaintiff was represented by Ross C. Andersen and Nathan B. Wilcox. Defendants were represented by Elizabeth King and John K. West.

## IV. Application of the Facts to the Law

### A. Whether Andersen's Statement Addressed a Matter of Public Concern

At the outset, the Court finds that Andersen's statement, as broadcast on the KTVX Television news broadcast, addressed a matter of some public concern. Possible changes in the sex-offender treatment program had the potential to affect and concern the public, and therefore constituted a matter of public concern.

### B. Whether the Statement Was a Substantial or Motivating Factor in Defendants' Decision to Terminate Andersen

The Court also finds that Andersen's statement was the only motivating factor in Andersen's termination. Prior to making the statement, Andersen had a good reputation within Bonneville as a dependable worker.

### C. Balancing Plaintiff's First Amendment Interests With Defendants' Countervailing Interests

The Court must decide whether the State's interest in maintaining the security and efficiency of its sex-offender treatment and rehabilitation facility was sufficiently important to overcome Plaintiff's free speech rights. Here, the facts show that Andersen's dismissal was based on Defendants' conclusions that (1) Andersen violated the DOC's policies and (2) her comments put the security and efficiency of Bonneville at risk. The Court will discuss both of those grounds for dismissal separately, weighing Defendants' interests against Andersen's in each instance.

### 1. Andersen's Violation of DOC Policies

Defendants first assert that their decision to fire Andersen was justified by the fact that she violated two provisions of the Department of Corrections' Code of Conduct. This argument is based upon the flawed notion that, as a matter of law, a public employer's interest in upholding office policies always outweigh employees' interests in free speech. To the extent that this notion has any merit at all, it has even less where, as here, the policies in question are constitutionally suspect.

One of the policies that Andersen allegedly violated is nothing less than a blanket prohibition on all employee criticism of the Department. Specifically, the policy provided that employees

[S]hall not make critical or disloyal public remarks about any policy, procedure, official act, or other member of the Department, nor gossip about the internal affairs of the Department. . . .

. . .

[And may not] act or behave privately or officially in such a manner that undermines the efficiency of the Department, causes the public to lose confidence in the Department, or brings discredit upon himself, the State of Utah, or the Department.

DOC Code of Conduct at AE02/03.06, 01, Plaintiff's Exhibit 5.

The other policy requires all personnel to receive authorization from the Public Affairs Director prior to releasing information about Bonneville to the public. DOC Code of Conduct at AGO–5*03.02, Defendant's Exhibit 7, Tr. at 265. In practice, this policy (like the other one) prevented employees from saying anything critical about the Department. *See* Testimony of DOC Media Spokesperson John Ford, Tr. at 174.

The policies appear to be overbroad, and therefore facially unconstitutional. However, the Court need not reach that conclusion in this case. Here, it is enough to conclude that Defendants cannot persuasively argue that the harm caused by Andersen's violation of two DOC policies outweighed Andersen's interest in speaking out on a matter of public

concern, and therefore justified the dismissal. In other words, Andersen's mere non-compliance with established policy is not enough to tip the *Pickering* scale in Defendants. If Defendants are to prevail, they must show that the actual or anticipated harm presented by Andersen's statement justified Andersen's dismissal under the *Pickering* balancing test.

### 2. Actual or Anticipated Harm Presented by Statement

The Court must weigh Andersen's interest in making the statement against Defendants' interest in protecting the public, protecting Andersen herself, and maintaining harmonious staff-inmate relations.

Andersen claims that her statement addressed a matter of significant concern to the public because the proposed changes in the sex-offender program would result in increased danger to the public. *See e.g.*, Tr. at 442. She argues the public concern surrounding her statement shrouded her words in a nearly impenetrable cloak of constitutional protection.

In response, Defendants argue that their interest in preserving harmonious staff-inmate relations, protecting the public, and protecting Andersen herself outweighed whatever First Amendment interest Andersen may have had in making the statement.

#### a. Need for Harmonious Staff-Inmate Relations at Bonneville

In fulfilling their responsibilities at Bonneville Defendants were charged with two seemingly incompatible tasks: (1) reforming sex offenders in a community treatment facility while (2) minimizing any danger that semi-incarcerated sex offenders may present to the public. This precarious position of public trust required Defendants to make harmonious staff-inmate relations a matter of paramount importance.

The dangers involved in running a halfway house for sex offenders are such that Bonneville employees must be allowed in some degree to control how, when, and what information pertaining to the Center may be communicated to the public and, more importantly, to the inmates themselves. *See* Testi-

mony of Bonneville Program Coordinator Kathy Ockey, Tr. at 347 ("[T]here is a higher standard [at Bonneville] than there is any place else, and it is because of that public trust and the need for safety.... We have to be very careful about what we say in public so that we don't endanger the community."). The need for this control is especially great where, as here, the information in question may allow inmates to render the staff ineffective by creating or magnifying a matter of internal controversy, pitting staff members against one another. *Id.; see also*, Testimony of DOC Director Lane McCotter, Tr. at 155–58 (explaining why harmonious inmate-staff relations are so important to the effective functioning of Bonneville).

Bonneville Program Coordinator Kathy Ockey testified that "[o]ne of the things that offenders do ... is try to manipulate [staff members]. One of their favorite things is to pit staff against staff ." Tr. at 362–63.

When Andersen, a volunteer with less than six months experience at Bonneville, appeared on the evening news and announced that "treatment time will be cut severely and the effectiveness of the parolee will not be as good as it is now, which will increase the risk to the public," she implicitly called into question the solidarity of the Bonneville staff and the future of every Bonneville inmate. She also announced a DOC decision prematurely and inaccurately, making it impossible for the DOC to discuss the matter thoroughly with staff and inmates before going public. *See* Testimony of DOC Field Operations Director Ray Wahl, Tr. at 272–75.

The written caption identifying Andersen as a Bonneville insider made the consequences of her statement even more severe. The caption validated Andersen's statement with a false imprimatur of authenticity, making it difficult for the DOC to correct the inaccuracies and refute the statement. To Defendants, the fact that Andersen appeared to be speaking on behalf of the DOC was as troubling as the statement itself. If fact, Kathy Ockey testified that "[i]f Jessica Andersen had gone on as Jessica Andersen without the tag of a volunteer from Bonneville, I would have called her and talked to

her about it but I wouldn't have terminated her." Tr. at 397.

Likewise, KTVX reporter Mary Sawyers testified that it was Andersen's status as a Bonneville insider that made KTVX interested in airing the statement in the first place. She explained that she "was glad we had somebody who was willing to come forward and speak publicly because that makes it stronger, you know, instead of saying 'this person told us' or 'sources say.' We didn't have to make that decision." Tr. at 80.

In other employment contexts, Andersen's conduct wouldn't necessarily be serious enough to justify termination under *Pickering.* But at Bonneville, incorrect or untimely press releases can cause problems far worse than departmental embarrassment—they can endanger the community, especially when they give sex-offender inmates reason to believe that their day-to-day routine is about to be dramatically altered for the worse.

According to Bonneville Director Gary Bortolussi, many Bonneville inmates have an irrational fear of any changes in their treatment regimen. Testimony of Gary Bortolussi, Tr. at 249–256. If they are led to believe that dramatic changes in their treatment are imminent, they may become extremely angry and discouraged, to the point where they may leave the facility without authorization, or even re-offend. *Id.*

Mindful of this tendency among Bonneville inmates, Defendants had a number of serious, well-founded safety concerns in the wake of Andersen's appearance on the news. Kathy Ockey was especially fearful, explaining that "if they are told they are going to get less effective treatment it gives them an excuse not to get the treatment anyway. 'Why should I try. The treatment is not good so I might as well leave.' [A statement like Andersen's] could result in all kinds of thinking errors." Testimony of Kathy Ockey, Tr. at 396.

For slightly different reasons, Bonneville Supervisor Nori Huntsman was also worried about how Andersen's statement could incite Bonneville's inmate population. She testified that several Bonneville inmates expressed deep resentment and anger over Andersen's statement. She explained that the inmates

> [W]ere extremely agitated about being represented on television as these horrible sex offenders.[4] It seems to me that the ones who came up to me had been in therapy for a while with us and they were long-term residents and they were angry. They were angry enough that they were shouting at me and I had to calm them down.

Tr. at 570–71.

While such internal turmoil is undesirable in any government office, it can be devastating at a half-way house for convicted sex-offenders. Kathy Ockey explained why facilities like Bonneville are so vulnerable, outlining Defendants concerns about Andersen's statement and the impact it would have on the Center:

> I was concerned about how the offenders would react if they saw this as an opportunity to pit staff against staff to get some things they wanted. I was concerned because if someone would violate one rule or standard that they have committed to uphold what other ones would they violate? With her access to these files would she release information from the offenders' files? Would she release other confidential information, things that she had been told in staff meetings? Would she encourage the offenders to rebel against this change if she didn't think it was right? Would she tell them to walk away?
>
> Those were the concerns that I was concerned about with the department, in that if she had these opinions what kind of services would she be providing? Would she be undermining what we were doing as we got to the point where we were making the transition from one program to another to try and keep that new program from coming in? All these things went through my mind. . . .

---

4. Although Andersen did not use the words "horrible sex offenders" in her statement, it appears from the record that some inmates interpreted Andersen's conclusion (that changes in treatment providers would result in "increased danger to the public") as being skeptical of any notion that the offenders possessed the ability to change.

I didn't think [her past record as a dependable worker] was applicable because her past record would not outweigh the current danger.

Tr. at 373–74.

As they evaluated the situation, Defendants concluded that absent swift remedial action, the effectiveness and security of the Center would be in jeopardy. *See* Testimony of DOC Regional Administrator Betty Gaines–Jones, Tr. at 193, 214–15 ("I [concluded] that her comment had an effect on the offenders and the staff based on their rumors, based on their concerns, based on some of their anger.... We were concerned about offenders ... becoming very, very aggressive towards people in the public."); Testimony of DOC Director Lane McCotter, Tr. at 147, 157–160 ("If we waited until the incident occurred and then had to react to it I don't think we would be doing our job in public safety."); Testimony of Bonneville Director Gary Bortolussi, Tr. at 249–250 ("No matter what the issue is if it is disruptive to their treatment it can become a security problem for the facility."); Testimony of DOC Field Operations Director Ray Wahl, Tr. at 287–89 (explaining his concern that Andersen's statement might "put the staff in jeopardy"); Testimony of Bonneville Program Coordinator Kathy Ockey, Tr. at 363 ("I felt like [Andersen's statement] was a real endangerment to the good working order of Bonneville, that it was a public danger.").

Defendants decided that two remedial measures were in order. First, they increased security at the Bonneville facility. For example, Defendants increased the frequency of their inmate security checks and head counts for several days following Andersen's statement. *See e.g.,* Testimony of Betty Gaines–Jones, Tr. at 215 ("We recommended that they beef up security even if it meant bringing in staff on their days off, borrowing from other centers for staff, making sure that they did not do accountability checks or anything alone, contact offenders in the community, call and see if they were at work, call and see if they were at home visits where they were supposed to be."); Testimony of Nori Huntsman, Tr. at 590 ("[W]e were doing more calls to people outside, we had staff doing more walk-throughs, more counts. We do counts and security checks on a regular basis but we stepped that up a little bit. I and others would walk around the facility and talk to people to see how things were going and kind of de-stress everybody.").

Second, Defendants decided that Andersen had to be terminated. The risk that Andersen's continued presence at Bonneville would further frustrate the work of the Department (and thereby endanger the public) was significant enough that Defendants felt they could not, in good faith, allow her to stay.

Under the circumstances, the First Amendment did not forbid Defendants from taking such action, nor did it require them "to allow events to unfold to the extent that [actual harm resulted] before taking action." *Connick,* 461 U.S. at 153. Defendants sensed a need for immediate action, fearing that any delay could result in unnecessary danger. *See* Testimony of DOC Field Operations Director Ray Wahl, Tr. at 289 ("I had to do something about it then. I couldn't wait for a problem to happen. I couldn't wait for somebody to slug a volunteer. I couldn't wait for somebody to walk away and then commit a rape against a child and then explain, gee, I thought there might be problems but nothing really happened then so I didn't do anything about it. I just kind of sat back and waited to see what would happen.").

Moreover, Bonneville employees had "the kind of close working relationships [with each other and with inmates] for which it can persuasively be claimed that personal loyalty and confidence are necessary to their proper functioning." *Pickering v. Board of Education,* 391 U.S. 563, 570, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). Close working relationships are especially important in a place like Bonneville where workplace harmony is essential—not only for "proper functioning," but for public safety. Since Andersen's statement threatened to disrupt workplace harmony at Bonneville, Defendants' judgment in deciding to fire her must be given "a wide degree of deference." *Connick,* 461 U.S. at 151–52; *see also Pickering,* 391 U.S. at 570.

### b. Concern for Andersen's Safety

Defendants were also concerned that in making the statement, Andersen had put her personal safety in jeopardy. One Bonneville inmate had left a "sexually inappropriate" note on Andersen's car (and, according to one account, later left a telephone message at her home number) several weeks before she was terminated. Testimony of Kathy Ockey, Tr. at 373–74. Defendants feared that this offender might interpret Andersen's statement as an indication that Andersen was "on his side," and become more aggressive in stalking her. For example, Kathy Ockey testified that

> I had concerns that the sex offenders would see [the statement] as Jessica being on their side and that she was doing a favor for them and thinking she would do other favors for them. We already had an incident where an offender had put some sexually inappropriate notes on her car, and so somewhere in his thought process he was thinking she would find this acceptable. I was concerned that this offender then might see this act as something supportive.

Tr. at 362. Ockey also testified that this concern did not arise out of hypothetical fear—it came from past experience. Less than one year before Andersen began an internship, a Bonneville staff member had been kidnaped and raped by an inmate who "had a crush on her." *Id.* at 373.

Counsel for Plaintiff hotly disputed this issue at trial, attempting to downplay the idea that Defendants were concerned for Andersen's safety. Specifically, Plaintiff elicited testimony that Defendants did not increase security when Andersen came back to Bonneville for her exit interview. *Id.* at 382.

Nevertheless, it appears to the Court that Defendants had genuine concern for Andersen's safety. This concern, among others, reasonably convinced Defendants that Andersen's internship at Bonneville needed to be terminated. Finding that Defendants may have overlooked possible security concerns when Andersen came in for her exit interview does not require the Court to find that the overall concern for Andersen's safety never existed.

Defendants had an obligation to protect Andersen from foreseeable harm. They reasonably concluded that Andersen's statement put Andersen at some risk.

### c. Andersen's Statement Addressed Matters of Limited Public Concern/Internal Office Policy

While Andersen's statement addressed a matter of public concern, the proposed treatment-provider change was also a matter of internal office policy, and was not itself a matter to be addressed by the general public through general election, open meetings, or other forms of direct public input. Under these circumstances, Andersen's statement is not entitled to the same protection as, for example, a statement endorsing a particular political candidate or ballot initiative. *See e.g., Connick,* 461 U.S. at 154 (explaining that, even when it may arguably address a matter of public concern, employee speech is entitled to less protection when it can be characterized as a "grievance concerning internal office policy").

Furthermore, the Court finds that in making the statement, Andersen was substantially motivated by her perception of how the proposed policy change would affect her own career. Andersen testified that her career objective was to continue working at Bonneville, under Dr. Kramer's supervision. *See* Tr. at 443–44 ("[I]t had been agreed by my supervisor, Dr. Kramer and I, that I would continue on at Bonneville. My position there was continuing and there was no problem with me being there, you know, and into the foreseeable future. I was able to stay there."); *see also* Tr. at 463–64. The proposed policy change would eliminate Dr. Kramer's position at Bonneville. Andersen knew that if Dr. Kramer's position at Bonneville were eliminated, her own position would also cease to exist. *See* Testimony of Stephen Kramer, Tr. at 46–48.

Andersen also knew that making the statement would please Dr. Kramer, and thereby strengthen her position as his trusted assistant. While Kramer denied telling Andersen to make the statement to the television news reporter, he gave Andersen every indication

that he would be pleased if she did so. He was very vocal in expressing his views to her. *See* Testimony of Stephen Kramer, Tr. at 46–48. When he learned that she had been approached by a reporter, and asked to make a statement on the evening news, he didn't try to stop her—even though he undoubtedly knew what the consequences would be. He deliberately declined to comment, withholding all semblance of either approval or disapproval. *See* Testimony of Jessica Andersen, Tr. at 435–36 ("The only thing [Kramer] said was not to release any confidential inmate information or security issues."); Testimony of Stephen Kramer, Tr. at 550 ("My response was 'I don't want to know about it, don't even tell me.'"). The Court is persuaded that under the circumstances, Andersen believed that making the statement would enhance her stature in the eyes of Dr. Kramer, and bolster her working relationship with him.

Even after being terminated, Andersen demonstrated an overwhelming sense of loyalty to Dr. Kramer. For example, at trial she admitted that she had lied to protect him. During her exit interview, Andersen told Kathy Ockey that prior to the broadcast, Kramer had been unaware of Andersen's contact with KTVX television reporters. This was a deliberate misrepresentation. In an attempt to justify this deliberate misrepresentation, Andersen reasoned that she didn't want Kramer "to go through what I was going through." Tr. at 496.

Andersen's personal interest in the policy change perhaps explains why she was willing to go on the evening news to criticize a policy about which she had such limited personal knowledge. Testimony of Jessica Andersen, Tr. at 498. Andersen admitted that she (1) was not familiar with the details of how the program would be run under the proposed changes, (2) was unaware of who would be awarded a contract to provide treatment to Bonneville inmates, and (3) had nothing to compare the existing treatment program against. *Id.*

It is therefore not surprising that Andersen's bold assertion that inmate treatment time would be "cut severely" "was completely false." Testimony of Kathy Ockey, Tr. at 359. *See also* Testimony of Betty Gaines-

Jones, Tr. at 207–07, Testimony of Ray Wahl, Tr. at 274. Stripped of accuracy, tainted with a strong element of personal interest, and pertaining to a matter of internal office policy, Andersen's statement can be said to have "touched upon matters of public concern in only a most limited sense." *Myers*, 461 U.S. at 154.

Because Andersen's speech arose "from an employment dispute concerning the [impact]" that the proposed policy changes would have on Andersen, "additional weight must be given to [Defendants'] view that [Andersen] has threatened the [Defendants'] authority to run the [Bonneville Center]." *Connick v. Myers*, 461 U.S. 138, 153, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). Here, that "additional weight" further tips the scale in Defendants' favor.

### d. Totality of Circumstances

The Court concludes that under the totality of the circumstances in this case, Defendants' decision to fire Andersen was appropriate because "the potential disruptiveness of the speech ... was enough to outweigh any First Amendment value it might have had." *Waters v. Churchill*, 511 U.S. 661, 114 S.Ct. 1878, 1890, 128 L.Ed.2d 686 (1994).

To Andersen, the KTVX interview was a chance to express her own strongly held opinions, to be in the public spotlight (if only for one brief moment), to vindicate her own career plans, and those of her friend and mentor Stephen Kramer. In other circumstances her statement (even though inaccurate)may have been appropriate, and entitled to greater constitutional protection. For instance, had Andersen waited until the DOC had made the decision, discussed the details of the new treatment program with the Bonneville inmates, and then made a public statement, her statement (even if incorrect) may not have created enough danger to justify her termination. Likewise, if Andersen's statement had dealt with an issue less likely to incite inmates, her dismissal may not have been in order.

But to Defendants, Andersen's statement was an act of insurrection—as a volunteer with less than six months of experience at Bonneville without seeking prior approval or

clarification, Andersen made a grossly inaccurate, televised statement criticizing a previously undisclosed, still-uncertain internal policy change. Moreover, Defendants reasonably perceived the statement as presenting serious security concerns, and a threat to public safety.

The Court concludes that Defendants were justified in terminating Andersen. Defendants' interests in "promoting the efficiency of the public services [Bonneville] performs through its employees" outweighed Andersen's interests in making the statement. *Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

## V. Qualified Immunity

■ Regardless of the Court's analysis under *Pickering*, Defendants are not liable to Ms. Andersen if they are entitled to qualified immunity. Because Defendants are government officials, qualified immunity protects them from personal liability unless they can be shown to have violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

■ The Court of Appeals' determined that since the "law has been clearly established since 1968 that public employees may not be discharged in retaliation for speaking on matters of public concern," Defendants were not entitled to qualified immunity. *Andersen v. McCotter*, 100 F.3d 723, 729 (10th Cir.1996). However, this conclusion was based upon the assumption that Ms. Andersen was a paid employee, not a volunteer. *See id.* ("We need not decide whether it was clearly established before this case that volunteers had *Pickering* protection, because Ms. Andersen was not a volunteer.... [S]he was a public employee who was paid by the State of Utah, who worked under the direction of officials at [Bonneville] and who was subject to the control of the DOC.").

In deciding whether the Tenth Circuit's conclusion concerning qualified immunity should be left intact, the Court must determine, on the basis of evidence presented at trial, whether Ms. Andersen was a volunteer or a paid intern at the time she was dismissed by Bonneville.

Andersen testified that the Board of Pardons agreed to count the hours she worked at Bonneville toward the twenty hours she was required to work every week at the Board of Pardons. Tr. at 421–22, 482, 536–537. That testimony was uncorroborated.

Contradicting Andersen's testimony, Board of Pardons Administrative Coordinator John Green explained that while the Board of Pardons gave Andersen permission to volunteer at Bonneville on her own time, the Board told her that her time at Bonneville would not be credited toward the wages she received from the Board of Pardons. Tr. at 609–610 ("My recollection and my comment to [Andersen] was whatever you do on your own time is your business so long as it does not result in a conflict of interest with our agency."). Green further testified that if the employment arrangement described by Andersen had ever existed, it would have been unprecedented, and could not have been arranged without a formal hearing and vote before the Board of Pardons' five-member parole board. Tr. at 609–610.

Defendants also presented evidence showing that Andersen's paid internship at the Board of Pardons ended two weeks before she made the televised statement, arguing that even if the Board of Pardons had at some point paid Andersen for her work at Bonneville, Andersen was no longer being paid at the time of her dismissal. *Id.* at 605–06. The Board of Pardons' payroll records show that her last paid workday was February 25, 1994. *Id.; see also* Plaintiff's Exhibits 18–27.

The Court is not persuaded by Andersen's unsupported assertions that the Board of Pardons' payroll records do not accurately reflect the effective dates of her employment at the Board of Pardons. The Court also finds that Andersen's testimony on this issue was evasive and lacking in credibility. To illustrate, when Andersen was asked if she

had any records to show that she was paid for any work completed after February 25, she evasively responded, "Not with me, no." Tr. at 477. That answer resulted in the following exchange:

| | |
|---|---|
| Counsel for Defendant: | Not with you? |
| Andersen: | No, I don't have that. |
| Counsel for Defendant: | Not at all? |
| Andersen: | No. |
| Counsel for Defendant: | In fact, you have no evidence to support your claim that you did work for pay for the Board of Pardons after February 25, 1994? |
| Andersen: | Only my word. |

*Id.* It appears to the Court that Andersen was attempting to imply falsely that she had evidence to back up her argument, and backed down only upon further inquiry. This conclusion is consistent with the Court's overall assessment of Andersen's credibility as a witness. *See e.g.*, Testimony of Jessica Andersen, Tr. at 496.

Andersen herself made several statements that suggest that she was not paid for her work at Bonneville. For example, she testified that during the relevant time period, she consistently worked more than the required twenty hours per week at the Board of Pardons, and therefore never had to rely on the Board of Pardons purported agreement to pay her for the hours she worked at Bonneville. Tr. at 533, 535–37. She also testified that her internship at the Board of Pardons had either ended or was about to end at the time she was terminated by Bonneville. Tr. at 488–489.

Also, upon being terminated at Bonneville, Andersen effectively admitted that she was a volunteer. During an exit interview with Bonneville volunteer coordinator Kathy Ockey, which Andersen secretly recorded, Andersen referred to herself as a volunteer while expressing her frustration, exclaiming

"just because I am a volunteer doesn't mean I don't have opinions." Plaintiff's Exhibit 4 at 9.

The overwhelming weight of the evidence presented at trial shows that Andersen was a volunteer.[5] In March 1994, volunteers did not have clearly established rights under *Pickering.* Any judicial opinions (issued prior to March 1994) that may suggest otherwise are factually distinguishable and are not controlling in this jurisdiction. *See e.g., Hyland v. Wonder,* 972 F.2d 1129 (9th Cir.1992); *Janusaitis v. Middlebury Volunteer Fire Dep't,* 607 F.2d 17 (2d Cir.1979).

Because she was a volunteer, and because volunteers did not have clearly established rights under *Pickering* in March 1994, Defendants are entitled to qualified immunity for terminating Ms. Andersen. Therefore, even if Defendants' decision to fire Andersen were not justified under *Pickering,* the result of this lawsuit would be the same because Defendants are protected by qualified immunity.

## VI. Conclusion

For the foregoing reasons, the Court finds in favor of Defendants. This case is hereby DISMISSED with prejudice.

---

**5.** In any event, Defendants reasonably believed that Andersen was a volunteer, and relied on that belief in making the decision to terminate her. *See* Tr. at 199, 276. Because Defendants reasonably believed that Andersen was a volunteer, Andersen cannot successfully argue that Defendants violated "clearly established statutory or constitutional rights of which a reasonable person would have known" unless volunteers had "clearly established" protection under *Pickering* in 1994. *Harlow,* 457 U.S. at 818; *cf. Waters v. Churchill,* 511 U.S. 661, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994) (explaining that in performing the *Pickering* balancing test, courts must consider the government employer's reasonably investigated understanding of the facts that gave rise to the challenged termination).