1999 UT App 065

**James CASSIDY, Plaintiff and Appellant,**

v.

**SALT LAKE COUNTY FIRE CIVIL SERVICE COUNCIL, Defendant and Appellee.**

No. 971525–CA.

Court of Appeals of Utah.

March 4, 1999.

Mary J. Woodhead, Salt Lake City, for Appellant.

Douglas R. Short and Jerry G. Campbell, Salt Lake City, for Appellee.

Before GREENWOOD, Associate P.J., JACKSON and ORME, JJ.

OPINION

GREENWOOD, Associate Presiding Judge:

¶ 1 This case comes to us on appeal from a decision of the Third District Court affirming a ruling of the Salt Lake County Fire Civil Service Council (the Council). Appellant James Cassidy claims the Council violated his First Amendment free speech rights by failing to promote him to captain. We affirm.

BACKGROUND

¶ 2 The Salt Lake County Fire Department hired Cassidy on August 1, 1982, as a firefighter. His free speech claim stems from two separate incidents. The first took place in 1990 when Cassidy filed a grievance challenging a new protocol regarding the handling of fire code violations uncovered during routine inspections. Cassidy asserted, among other things, that the change was illegal and contrary to the fire department's mission. Captain Scott Collins, Cassidy's immediate superior, and Fire Chief Larry Hinman both rejected Cassidy's grievance. Cassidy then went to Terry Holzworth, Director of Public Works, who rejected Cassidy's approach to him as being outside the grievance process. Finally, Cassidy appealed to the Salt Lake County Civil Service Review Commission, which also rejected Cassidy's appeal as outside its jurisdiction.

¶ 3 The second incident occurred in 1992 when Cassidy objected to the creation of a "wildland fire crew." The proposed wildland fire crew would allow the fire department to hire and train part-time firefighters to fight brush fires, thus allowing full-time firefighters to concentrate on structural fires or fires threatening lives and property. After expressing his opposition to his captain and other co-workers, Cassidy approached Deputy Chief Don Berry. Although Cassidy told Deputy Berry he would "take action to see that the department didn't hire those people," he never filed a formal grievance regarding the creation of the wildland fire crew.

¶ 4 In October 1992, Cassidy was promoted to the position of Hazardous Material Firefighter with an increase in pay. As of October 19, 1992, Cassidy was the highest ranking candidate on the department's promotional register. Nevertheless, neither Cassidy nor Jay Miles, who were both qualified applicants, was interviewed for a promotion announced that month. This was a violation of Salt Lake County Civil Service policy 2150.3.2.2, which required that if an individual had not been interviewed for a position within the last ninety days before the interview, he or she must be re-interviewed for the position. Because Cassidy had recently received a promotion, and because the department mistakenly believed Cassidy had been interviewed within the ninety-day window, it was assumed there was no need to interview him. The department subsequently announced that Mont Cooper was given the captain position.

¶ 5 Upon learning of its oversight, however, the department granted both Cassidy and Miles interviews, essentially to satisfy the technical requirements of the Civil Service rules. During Cassidy's interview, the interviewers discovered Cassidy had secreted a tape recorder under his jacket and was recording the interview. On November 23, Cassidy filed a grievance with the Council, alleging he had been denied fair procedure in the interview process.

¶ 6 In the meantime, another station captain position became available. Four candidates were eligible for that position: George Painter, Miles, Cooper, and Cassidy. The interview committee, consisting of Assistant Chief Corack, Assistant Chief Swenson, Battalion Chief Lindburg, and Deputy Chief Berry, convened in December 1992 to conduct interviews for that position and the position prematurely given to Mont Cooper. Chief Hinman voluntarily removed himself from serving on the committee because of the recent grievance filed by Cassidy and told Berry that he would affirm any recommendation made by the committee. After the interviews, the committee unanimously

recommended retaining Cooper as captain and promoting Painter to captain. Chief Hinman affirmed those recommendations.

¶ 7 In response to Cassidy's grievance concerning the interview process, the Council conducted an administrative hearing on January 28, 1993, but refused to consider the grievance because it believed it had no jurisdiction in matters of hiring and promotion. Cassidy appealed that decision to the Third District Court. Judge Timothy R. Hanson ruled the Council did have jurisdiction and ordered the Council to hear Cassidy's grievance. On April 11, 1995, the Council exercised its jurisdiction, ruling that Fire Chief Hinman did not violate Cassidy's First Amendment rights and affirming the fire chief's decision that other candidates were more qualified than Cassidy.

¶ 8 Cassidy appealed the Council's ruling to the Third District Court on May 11, 1995, arguing that (1) his First Amendment and due process rights were violated, (2) the fire department violated Utah law by improperly promoting other candidates, and (3) the fire department had retaliated against him for exercising his constitutional rights. The court limited its review to the record before the Council and entered judgment for the Council. Cassidy now appeals, arguing the trial court erred by not ruling that he suffered an adverse employment action by the department's failure to promote him,[1] his complaints were protected speech, and the department illegally refused to promote him in violation of his First Amendment free speech rights. The Council responds that Cassidy's action must be dismissed because he failed to join the fire chief as a necessary and indispensable party. The Council also argues Cassidy failed to marshal the evidence supporting the trial court's findings and denies any violation of Cassidy's First Amendment rights.

## ANALYSIS

### I. Necessary and Indispensable Party

 ¶ 9 We first address the Council's argument, raised for the first time on appeal,

that Chief Hinman is a necessary and indispensable party to this action. Generally, we will not consider issues not preserved in the trial court absent plain error or exceptional circumstances. *See State v. Schweitzer,* 943 P.2d 649, 654 n. 3 (Utah Ct.App.1997). Nevertheless, a party may raise the issue of failure to join an indispensable party at any time in the proceedings, including for the first time on appeal. *See Seftel v. Capital City Bank,* 767 P.2d 941, 944 (Utah Ct.App. 1989), *aff'd sub nom. Landes v. Capital City Bank,* 795 P.2d 1127 (Utah 1990). We therefore address the merits of the Council's argument.

¶ 10 Rule 19 of the Utah Rules of Civil Procedure governs the compulsory joinder of parties to an action. Under the Rule's scheme, a person should be joined as a party if "in his absence complete relief cannot be accorded among those already parties." Utah R. Civ. P. 19(a)(1); *accord Landes,* 795 P.2d at 1130–31. Joinder is also compulsory if the absent person claims an interest in the subject matter of the action and continuing without that person would (1) impair the person's ability to protect his or her interest, or (2) expose the parties already joined to the action to multiple litigation. *See Landes,* 795 P.2d at 1130–31.

¶ 11 The Council has attempted to show that Chief Hinman is necessary to this action by carefully dissecting the relevant code sections authorizing the Firemen's Civil Service system. *See* Utah Code Ann. §§ 17–28–8 and –9 (1995). The crux of the Council's argument is that "only the fire chief can promote Mr. Cassidy," and that "any judgment would be prejudicial without his presence as a party."

¶ 12 We agree with Cassidy that the Council's argument is essentially a reincarnation of the argument it tendered before the district court when the Council claimed it did not have jurisdiction to hear Cassidy's griev-

---

1. The trial court did make a finding "that a denial of a promotion based upon the plaintiff's exercise of his right of free speech can be an adverse employment action." The court, howev-

er, made no finding that *Cassidy* suffered from such an action, and both parties raised this issue on appeal. Therefore, we address the issue in this opinion.

ance. The Council insisted at that time it "lack[ed] jurisdiction or authority over county fire [department] hiring and promotional issues except as a council may adopt rules consistent with the delegation of powers and duties as provided in Chapter 28 of Title 17." The district court, however, rejected that reasoning, concluding the Council did have jurisdiction to hear Cassidy's grievance, and ordered the Council to consider his grievance. In an order dated November 17, 1997, this court also rejected the Council's argument that it lacked subject matter jurisdiction to hear Cassidy's grievance.

¶ 13 The Council has the authority to adopt rules, establish procedures, and recommend guidelines that are binding on the fire chief and other employees or agents of the department. *See* Utah Code Ann. § 17–28–2.4 (1995). Moreover, applicable law provides that the Council is the proper defendant for this dispute and directed Cassidy to bring an action "against the County Fire Civil Service Council in its official capacity"—not the fire chief—if Cassidy was "aggrieved" by the Council's determination. *See* Utah Code Ann. § 17–28–13(1)(1995). Cassidy followed that mandate.

¶ 14 As the Council must abide by our decision, so must the fire chief and the department abide by the Council's action as directed by this court. Complete relief, even absent Chief Hinman, therefore is available to either party. Further, neither Chief Hinman's interests nor those of the parties before us are compromised by Chief Hinman's absence. Accordingly, we determine Chief Hinman is not a necessary and indispensable party to this action.

## II. Adverse Employment Action

¶ 15 Turning to Cassidy's First Amendment claims, we initially address whether Cassidy suffered an "adverse employment action" sufficient to constitute a violation of his First Amendment rights. *See Rutan v. Republican Party*, 497 U.S. 62, 73–77, 110 S.Ct. 2729, 2736–38, 111 L.Ed.2d 52 (1990). The Council asserts Cassidy's claim must fail because a refusal to promote cannot be considered an adverse employment action.

¶ 16 In support of its argument, the Council cites two decisions from the Seventh Circuit, *Dahm v. Flynn*, 60 F.3d 253 (7th Cir.1994), and *DeGuiseppe v. Village of Bellwood*, 68 F.3d 187 (7th Cir.1995). The Council maintains these cases, addressing retaliation claims under 42 U.S.C. § 1983, establish in the federal civil rights context that to be adverse, a change in employment conditions must be material such "that the employee is made worse off by it." *DeGuiseppe*, 68 F.3d at 192. In *Dahm*, the Seventh Circuit, while examining what action could be "materially adverse" to a public employee, quoted its prior decision in *Crady v. Liberty National Bank and Trust Co.*, 993 F.2d 132, 136 (7th Cir.1993) (applying the burden-shifting test of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), to federal age discrimination claim), in which the court included as materially adverse changes "a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Dahm*, 60 F.3d at 257. Because a failure to promote did not appear in that list as an adverse employment action, the Council urges us to dismiss Cassidy's claim.

¶ 17 We believe the Council has misunderstood what *Dahm*, *DeGuiseppe*, and, most importantly, *Rutan* stand for. Although *Dahm* does not specifically list a failure to promote as an adverse employment action, its omission does not necessarily support the Council's assertion. Moreover, the *Dahm* court also cited *Smith v. Fruin*, 28 F.3d 646, 649 n. 3 (7th Cir.1994), which declares that "even minor forms of retaliation can support a First Amendment claim, for they may have just as much of a chilling effect on speech as more drastic measures." *Dahm*, 60 F.3d at 257. Further, the *DeGuiseppe* court cited *Pierce v. Texas Department of Criminal Justice*, 37 F.3d 1146, 1149 (5th Cir.1994), cert. denied, 514 U.S. 1107, 115 S.Ct. 1957, 131 L.Ed.2d 849 (1995), a decision that expressly included a refusal to promote as an adverse employment action. *See DeGuiseppe*, 68 F.3d at 191.

¶18   Finally, and most fatal to the Council's position, the United States Supreme Court in *Rutan* rejected the Seventh Circuit's "unduly restrictive" standard "that only those employment decisions that are the 'substantial equivalent of a dismissal' violate a public employee's rights under the First Amendment." *Rutan*, 497 U.S. at 75, 110 S.Ct. at 2737 (citing *Rutan v. Republican Party*, 868 F.2d 943, 954–57 (7th Cir.1989)). Consequently, the Court included promotions based on political affiliation or patronage as "an impermissible infringement on the First Amendment rights of public employees."[2] *Id.* The Court even suggested in dictum that the First Amendment protects a public employee from " 'an act of retaliation as trivial as failing to hold a birthday party for a public employee ... when intended to punish her for exercising her free speech rights.' "[3] *Id.* at 75–76 n. 8, 110 S.Ct. at 2738 n. 8 (citations omitted).

¶19   While we express no opinion as to whether the First Amendment extends to protect against a retaliatory cancellation of birthday celebrations, we do agree that a threat of non-promotion or a retaliatory failure to promote may indeed threaten to chill free speech, just as employment termination does.   Accordingly, the Council's actions warrant First Amendment scrutiny.

III.   Free Speech and Public Employment

■   ¶20   The State may not condition public employment on conditions that infringe on a public employee's right to free speech.   *See Connick v. Myers*, 461 U.S. 138, 142, 103 S.Ct. 1684, 1687, 75 L.Ed.2d 708 (1983) (citing *Branti v. Finkel*, 445 U.S. 507, 515–16, 100 S.Ct. 1287, 1293, 63 L.Ed.2d 574 (1980); *Perry v. Sindermann*, 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972); *Pickering v. Board Of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968); *Keyishian v. Board of Regents*,

385 U.S. 589, 605–06, 87 S.Ct. 675, 684–85, 17 L.Ed.2d 629 (1967)).   In safeguarding that right, the United States Supreme Court has attempted to strike a balance between a public employee's right, as a citizen, to free speech on matters of public concern and the State's interest in efficiently maintaining public services.   *See Pickering*, 391 U.S. at 568, 88 S.Ct. at 1734–35; *see also Elwell v. Board of Educ.*, 626 P.2d 460, 467–68 (Utah 1981)(Maughan, C.J., dissenting)(citing *Mt. Healthy City Bd. of Educ. v. Doyle*, 429 U.S. 274, 284, 97 S.Ct. 568, 574, 50 L.Ed.2d 471 (1977)).   The Court has also protected a public employee's speech, even though made privately, as long as the employee speaks as a citizen and the speech relates to a public concern.   *See Givhan v. Western Line Consol. Sch. Dist.*, 439 U.S. 410, 415–16, 99 S.Ct. 693, 696–97, 58 L.Ed.2d 619 (1979) (stating "[n]either the [First] Amendment itself nor our decisions indicate that this freedom is lost to the public employee who arranges to communicate privately with his employer rather than to spread his views before the public.").

¶21   Still, "the First Amendment does not ... guarantee absolute freedom of speech," *Board of County Comm'rs v. Umbehr*, 518 U.S. 668, 116 S.Ct. 2342, 2347, 135 L.Ed.2d 843 (1996), and " 'there may be limits on the extent to which an employee in a sensitive or policymaking position may freely criticize his superiors and the policies they espouse.' " *Janusaitis v. Middlebury Volunteer Fire Dept.*, 607 F.2d 17, 26 n. 12 (2nd Cir.1979)(quoting *Pickering*, 391 U.S. at 570 n. 3, 88 S.Ct. 1731).   The United States Supreme Court has also recognized that, when regulating speech, "the government as employer indeed has far broader powers than does the government as sovereign." *Waters v. Churchill*, 511 U.S. 661, 671, 114 S.Ct. 1878, 1886, 128 L.Ed.2d 686 (1994).   As a result, the Court has "consistently given greater deference to government predictions

---

**2.**  Although *Rutan* was a political affiliation case, we agree with the Fifth Circuit that *Rutan* applies to retaliation claims.   *See Pierce*, 37 F.3d at 1149.

**3.**  The Fifth Circuit subsequently noted a literal reading of this sentence " 'would be a serious mistake' " and was "inconsistent with the body

of the opinion [in *Rutan* ]."  *Pierce*, 37 F.3d at 1150 n. 1 (citations omitted).   Nevertheless, the District of Columbia Court of Appeals applied the *Rutan* dictum as the standard for actionable harm in a First Amendment retaliation claim. *See Tao v. Freeh*, 27 F.3d 635, 639 (D.C.Cir. 1994).

of harm used to justify restriction of employee speech than to predictions of harm used to justify restrictions on the speech of the public at large." *Id.* at 673, 114 S.Ct. at 1887.

¶ 22 Recently, the federal district court for Utah thoughtfully examined the history of the Supreme Court's decisions regarding free speech in the public employment arena and determined that the *Pickering* analysis falls into four parts. *See Andersen v. McCotter,* 3 F.Supp.2d 1223, 1225–29 (D.Utah 1998)(examining *Pickering; Connick; Rankin v. McPherson,* 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987); and *Waters* ). First, the party challenging an employer's action must demonstrate his or her speech addressed a matter of public concern. *See id.* at 1225. Second, the employee must establish causation; in other words, the employee must show his or her protected speech played a substantial role in causing the adverse employment action. *See id.* Third, if the employee establishes causation, the employer may escape liability by demonstrating it would have made the same decision regardless of the speech. *See id.* Fourth, if the reviewing court determines an adverse employment action was in retaliation for the employee's exercise of protected speech, the court must weigh the employee's free speech rights against the interests of the public agency in the efficient operation of its public service. *See id.* Finally, if the public agency's interests outweigh the employee's free speech rights, the adverse employment action may be justified. *See id.; Umbehr,* 116 S.Ct. at 2347–48.

¶ 23 Using this analysis, we first address whether Cassidy's speech addressed a public concern.

### A.

■ ¶ 24 Cassidy asserts, and the trial court found, that Cassidy's 1992 complaint regarding the wildland fire crew addressed a public concern. The trial court, however, made no specific finding regarding the 1990 protocol modification grievance; nevertheless, Cassidy maintains on appeal that this speech is also protected. Whether speech relates to a public concern is a mixed question of law and fact. *See Andersen,* 3

F.Supp.2d at 1225. Accordingly, we defer to the trial court's determination of underlying facts unless we find clear error; however, legal conclusions about the protected status of Cassidy's speech are within the province of this court. *See Connick,* 461 U.S. at 148 n. 7, 103 S.Ct. at 1690 n. 7; *Andersen,* 3 F.Supp.2d at 1225; *Drake v. Industrial Comm'n,* 939 P.2d 177, 181 (Utah 1997).

¶ 25 To determine whether Cassidy's speech addressed a public concern, we look to the Supreme Court's decision in *Connick* for instruction. In that case, the respondent Myers, an assistant district attorney in New Orleans, filed a civil rights claim under 42 U.S.C. § 1983 after she was terminated for insubordination. *See Connick,* 461 U.S. at 141, 103 S.Ct. at 1687. After her supervising district attorney transferred her to a different section in the criminal court—a move she strongly opposed—she expressed her dissatisfaction to her supervisors. *See id.* Myers also distributed a survey to other district attorneys in her office "concerning office transfer policy, office morale, the need for a grievance committee, the level of confidence in supervisors, and whether employees felt pressured to work in political campaigns." *Id.*

¶ 26 The Court ultimately decided that none of Myers's speech, except one question on her survey, touched upon a public concern. *See id.* at 1691. In reaching that conclusion, the Court reiterated that no " 'general standard against which all … statements may be judged' " existed. *Id.* at 1694 (quoting *Pickering,* 391 U.S. at 569, 88 S.Ct. at 1735). Instead, the Court examined the "content, form, and context of a given statement, as revealed by the whole record." *Id.* at 1690.

¶ 27 The record in this case reveals that the 1990 proposed changes in department inspection protocol potentially affected public safety. Likewise, the creation of the wildland fire crew not only concerned the internal operation of the department but also touched upon the public's interest in how the department provided essential public services. Therefore, Cassidy's speech, both in 1990 and in 1992, when viewed in the context

of the entire record, addressed public concerns.

### B.

¶ 28 Seeing no clear error in the trial court's finding that Cassidy's speech addressed public concerns, we direct our attention to the final factor in the *Pickering* analysis. For even if Cassidy can establish causation and the Council cannot show the same decision would have been made absent Cassidy's speech, Cassidy's claim must still fail if the department's interests in " 'promoting the efficiency of the public services it performs through its employees' " outweigh Cassidy's interests in " 'commenting on matters of public concern.' " *Umbehr*, 116 S.Ct. at 2347–48 (quoting *Pickering*, 391 U.S. at 568, 88 S.Ct. at 1734). This determination is a mixed question of law and fact, leaving the final determination of law to the reviewing court. *See Andersen*, 3 F.Supp.2d at 1225.

¶ 29 First Amendment jurisprudence normally provides broader protection to content-based speech of private citizens. *See, e.g., New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 725–26, 11 L.Ed.2d 686 (1964). That balance shifts somewhat, however, when the citizen is a public employee. Justice O'Connor explained this difference is justified by the government's unique position as employer:

> The government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer. The government cannot restrict the speech of the public at large just in the name of

efficiency. But where the government is employing someone for the very purpose of effectively achieving its goals, such restrictions may well be appropriate.

*Waters*, 511 U.S. at 675, 114 S.Ct. at 1888. Thus, the Supreme Court has justified curtailing even core First Amendment rights of public employees, such as the right to participate in political campaigns. *See id.* at 1886 (citing *Broadrick v. Oklahoma*, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973); *Civil Service Comm'n v. Letter Carriers*, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973); *Public Workers v. Mitchell*, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947)); *see also Rutan*, 497 U.S. at 99, 110 S.Ct. at 2750 (Scalia, J., dissenting)(recognizing political expression standards differ for public employees).

¶ 30 Even if we were to conclude Cassidy's speech played a significant role in the Council's decision not to promote him, we agree with the trial court that Cassidy "carried his concerns far beyond his right to address a public concern and [that] his grievance became a vendetta against the fire department." The record indicates Cassidy's intent was to undermine his supervising officers and create a disruptive atmosphere in the department.[4] For example, Cassidy admitted he liked "screwing around" with the administration and thought they were "stupid." In 1990, Cassidy properly filed his grievance regarding the inspection protocol modification; however, he undermined his fire chief's position by going directly to Chief Hinman's superior—outside the grievance process—to influence the fire chief's decision.[5] Cassidy also threatened Deputy Chief

---

**4.** We note that Cassidy failed to adequately marshal the evidence in support of the trial court's findings. Thus, we " 'assume[ ] that the record supports the findings of the trial court....' " *Heber City Corp. v. Simpson*, 942 P.2d 307, 312 (Utah 1997) (quoting *Saunders v. Sharp*, 806 P.2d 198, 199 (Utah 1991)). The trial court in this case found "there [was] no showing by [Cassidy] he was denied a promotion to captain based upon his criticism of the wildland fire crew." We have no reason to conclude that finding was clearly erroneous.

**5.** Cassidy insists that Salt Lake County, Utah, Ordinance 2.80.110(A) protects this conduct. We disagree. Under the analogous federal whis-

tle blower statute, 5 U.S.C. § 2302, a public employee is only protected when "the employee's primary motivation for making the disclosure [is] a desire to inform the public, and not for vindictiveness or personal advantage." *Horton v. Department of the Navy*, 66 F.3d 279, 282 (Fed.Cir. 1995), *cert. denied*, 516 U.S. 1176, 116 S.Ct. 1271, 134 L.Ed.2d 218 (1996). The record reveals Cassidy did not attempt to make his complaints public, only that he privately skirted the department's grievance procedure to put pressure on Chief Hinman.

Moreover, under the federal statute, the public employee must show a significant nexus between the protected disclosure and the alleged retaliato-

Berry concerning the wildland fire crew, saying he would "take action to see that [the department] didn't hire those people." In addition, the tape-recorder incident in November 1992 bears upon the *context* in which department officials decided to pass over Cassidy. *Cf. Umbehr*, 116 S.Ct. at 2352 (explaining, even if plaintiff prevailed, "facts discovered after termination that would have led to a later termination anyway ... would be relevant in assessing what remedy is appropriate").

¶ 31 Actions such as these tended to disrupt the efficient management of the fire department and, as such, Cassidy cannot lay claim to First Amendment protection. Also significant to our analysis is the fact that the fire department is not unlike a military organization, which relies on harmony and loyalty not only among the rank and file but also between firefighters and their supervisors. *See, e.g., Norton v. Nicholson*, 187 Ill.App.3d 1046, 135 Ill.Dec. 485, 543 N.E.2d 1053, 1061 (1989)(stating First Amendment "does not require [the fire department to] tolerate action which it reasonably believed would disrupt its operations, undermine the authority of its Fire Chief and destroy working relationships within the Department"), *cert. denied*, 496 U.S. 938, 110 S.Ct. 3217, 110 L.Ed.2d 665 (1990). Dissension in the ranks, especially when that dissension threatens trust and the chain of command in emergency situations, should not stand in the way of the fire department's duty to protect the safety of the public and the safety of its personnel. Thus, "[w]hen close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate." *Connick*, 461 U.S. at 151–52, 103 S.Ct. at 1692. We believe such deference is appropriate in this case.

¶ 32 We do not mean to suggest that firefighters have no room to question the legitimacy of their superior's actions. Each public employee's First Amendment claim must be considered on a case-by-case basis. *See id.* at 154, 103 S.Ct. at 1694 (citing *Pickering*, 391 U.S. at 569, 88 S.Ct. at 1735); *Andersen*, 3 F.Supp.2d at 1225. In this instance, however, the public concerns involved, when weighed against the fire department's significant interests in maintaining order and efficiency, simply do not justify overruling the Council's decision.

¶ 33 Because "[t]he *Pickering* balance requires full consideration of the government's interest in the effective and efficient fulfillment of its responsibilities to the public," *Connick*, 461 U.S. at 150, 103 S.Ct. at 1692, we conclude the Council did not violate Cassidy's First Amendment rights when it refused him a promotion. Accordingly, we affirm the trial court's decision.

## CONCLUSION

¶ 34 An adverse employment action, for purposes of First Amendment scrutiny, includes a failure to promote. Further, Cassidy's speech addressed public concerns and thus was protected speech. The trial court did not err, however, when it refused to find the department violated Cassidy's First Amendment free speech rights. As the trial court found, Cassidy's actions and behavior exceeded his exercise of free speech and undermined department morale and efficiency. The department's interests in efficiently managing its operations outweighed Cassidy's right to speak. We therefore affirm the trial court's decision to uphold the Council's ruling.

¶ 35 NORMAN H. JACKSON, Judge, and GREGORY K. ORME, Judge, concur.

ry action. *See id.* at 283. In this case, over two years passed between the time Cassidy first filed a grievance in 1990 to the time he was denied a promotion. Six months also elapsed between his complaint in April 1992 concerning the wildland fire crew and the Council's action in November

1992. Additionally, despite his actions, Cassidy was *promoted* to Hazardous Material Firefighter during this same period. These facts, in our opinion, do not establish causation sufficient to satisfy the federal scheme or to support application of the local ordinance.